In re EAGSON CORPORATION,
Bankrupt.

FIRST PENNSYLVANIA BANK
N.A., Plaintiff,

v.

Myron HARRIS, Trustee in Bankruptcy of Eagson Corporation, Willard T. Jackson, Harold E. Stassen, Central Penn National Bank, Mary Jane Black, Robert E. Breidenstein, Commonwealth of Pennsylvania (Bureau of Corporation Taxes, Department of Revenue), Stockard Shipping & Terminal Corp., American Equipment Rental, Defendants.

Bankruptcy No. 76–1971G.

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 24, 1984.

James M. Matour, White & Williams, Philadelphia, Pa., for Central Penn Nat. Bank, defendant.

Frank J. Eisenhart, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for Mary Jane Black, also known as Mary Jane Brown, individually and as Executrix under the Will of Edward M. Brown, Deceased, defendant.

Leslie J. Carson, Jr., Philadelphia, Pa., for Robert E. Breidenstein, defendant.

Marjorie O. Rendell, Duane, Morris & Heckscher, Philadelphia, Pa., for creditors' committee under Chapter XI.

Harry G. Mahoney, Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., for Stockard Shipping Co., defendant.

Robert G. Cherwony, Kraft & Kraft, Philadelphia, Pa., for American Equipment Rental, defendant.

J. Dennis Faucher, Kristin R. Hayes, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for plaintiff, First Pennsylvania Bank N.A.

Myron Harris, Philadelphia, Pa., trustee.

Horace A. Stern, Wexler, Weisman, Forman & Shapiro, P.C., Philadelphia, Pa., for trustee/defendant, Myron Harris.

Joseph Pokart, Pokart & Pokart, New York City, for defendant, Willard T. Jackson.

Guillermo L. Bosch, Stassen, Kostos & Mason, Philadelphia, Pa., for Harold E. Stassen, defendant.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue presented herein is how much the plaintiff is entitled to receive out of the $625,000.00 proceeds presently being held by the trustee as a result of the latter's sale of a certain parcel of realty formerly owned by the bankrupt. While we conclude that the plaintiff is entitled to recover some of the proceeds held by the trustee pursuant to a state court judgment the plaintiff recovered against the bankrupt, we nonetheless find that, predicated on various admissions made by the plaintiff, its claim to the proceeds is non-interest bearing and limited to $280,000.00.

The undisputed facts of the instant case are as follows:[1] On October 19, 1976, Eagson Corporation ("the bankrupt") filed a petition for an arrangement under Chapter XI of the Bankruptcy Act ("the Act")[2] and was adjudicated a bankrupt on November 16, 1979. On November 25, 1980, we entered an order authorizing Myron Harris, the trustee in bankruptcy, ("the trustee") to sell a parcel of realty known as the "Eagson Parcel" at a private sale, free and clear of liens and encumbrances, to Thomas E. Clem and Rebecca J. Clem for the sum of $650,000.00 (later reduced to $625,000.00 pursuant to our order of March 26, 1981).[3] With respect to the treatment of the various liens against the Eagson Parcel, our previous order of May 5, 1980, provided, in relevant part, as follows:

4. At settlement for the property, the liens of all mortgages, judgments and tax assessments held by the Defendants above-named,[4] shall be divested from the property which is the subject of the proposed sale, and the claims of the holders of such liens and encumbrances shall be relegated to the proceeds of the sale, to be paid therefrom if, as and when proved.[5]

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

2. Although the Bankruptcy Act has been superseded by the Bankruptcy Code as of October 1, 1979, the provisions of the Act still govern petitions filed before that date. The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 403, 92 Stat. 2683 (1978).

3. *See* Exhibits P–2 and P–3.

4. The trustee's complaint to sell free and clear, which was filed on March 25, 1980, names the same defendants (with the addition of the bank) as does the bank's instant complaint. The trustee's complaint made it unnecessary for us to decide a previous adversary proceeding filed by the bank on February 24, 1978, wherein the bank requested leave to complete a sheriff's sale of the Eagson Parcel.

5. *See* P–1.

None of the proceeds of the aforesaid sale have, as yet, been distributed to any of the lienholders. On January 26, 1983, First Pennsylvania Bank N.A. ("the bank"), the holder of a mortgage against the Eagson Parcel, filed the instant complaint, wherein the bank alleged that the lien it has on the proceeds of the sale of the Eagson Parcel (based on its status as a mortgagee) has priority over the liens of other defendants named in said complaint.[6]

The basic writings which form the basis of bank's claim are four documents, all of which were executed on November 6, 1972. On that date, the bank entered into a Loan Agreement ("the loan agreement") with Joan M. Weber, Forward Lands, Inc. and the Foerderer Tract Committee, Inc. ("the borrowers") whereby the bank agreed to loan the borrowers $3,295,000.00.[7] The loan was evidenced by a note ("the note")[8] and secured by a Mortgage ("the mortgage")[9] on land commonly known as the "Foerderer Tract", including the portion of the Foerderer Tract owned by the bankrupt, the Eagson Parcel.[10] While the bankrupt signed both the note and the mortgage, it is undisputed that it was not a party to the loan agreement. Simultaneously with entering into the loan agreement, note and mortgage, the bank and the borrowers entered into an agreement with Willard T. Jackson, the holder of two existing mortgages on the Eagson Parcel, to subordinate those mortgages to the bank's mortgage.[11]

A default under the note occurred in May of 1974, and on August 23, 1974, the bank entered judgment by confession ("the judgment") in the Court of Common Pleas of Montgomery County, Pennsylvania, against the borrowers and the bankrupt in the amount of $2,805,497.14 on account of said default.[12] A sheriff's sale of the Eagson Parcel was scheduled for October 20, 1976,[13] but said sale was, of course, stayed when the bankrupt filed the aforesaid petition for an arrangement under Chapter XI of the Act.

Meanwhile, as a result of a separate action filed in the Court of Common Pleas of Montgomery County ("the Court of Common Pleas") captioned *Edward G. Bogosian and Kathy A. Bogosian, his wife v. Foerderer Tract Committee, Inc.*, No. 74–14866, Sandra Schultz Newman ("the receiver") was appointed receiver of the Foerderer Tract Committee, Inc., one of the three borrowers involved in the aforementioned loan agreement. The receiver negotiated an agreement dated May 14, 1979, for the sale of the Foerderer Tract for $3,500,000.00. The Court of Common Pleas approved the agreement of sale by order dated May 15, 1979, as a consequence of which the Foerderer Tract was to be sold for that amount in the event that a higher price was not realized at a public sale.

Following the entry of the aforesaid order, the bank and the receiver, without our approval, entered into a "Stipulation and

---

**6.** Count I of the bank's complaint seeks the entire proceeds of the sale of the Eagson Parcel on the ground that the amount owed the bank by the bankrupt exceeds the amount of the proceeds. In the alternative, Count II of said complaint seeks $280,000.00 of the proceeds plus interest thereon from October 19, 1976, on the ground that the delay in the sale of the Eagson Parcel injured the bank and resulted in an increase in the value of the property from which all the lienholders will benefit, as would the bank. Only five defendants filed answers to the bank's complaint. All five answers basically raised the same affirmative defenses. Several of these defendants appeared through their counsel at the trial of the complaint, although none of them actually participated. These defendants take the position that their lien claims should be elevated in priority if the bank's claim is disallowed. It was agreed at the trial that the only issue to be determined in this case is the validity and priority of the bank's claim against the proceeds of the sale of the Eagson Parcel.

**7.** *See* Exh. P–4.

**8.** *See* Exh. P–5.

**9.** *See* Exh. P–6.

**10.** The Eagson Parcel is located within the Foerderer Tract and the bankrupt's president lived in the house located on the Eagson Parcel.

**11.** *See* Exh. P–7.

**12.** *See* Exh. P–8.

**13.** *See* Exh. P–10.

Agreement" ("the stipulation") [14] dated June 8, 1979 (at which time the bankrupt was a chapter XI debtor), which, in pertinent part, provided:

1. Subject to the provisions of paragraph 9 hereof, Bank shall be paid the sum of $2,500,000 in full, complete and total satisfaction of that portion of any and all debts due it for, because of or on account of its loan to the Foerderer Tract Committee, Inc., Joan M. Weber, and Forward Lands, Inc. (including but not limited to all costs, interest, fees, expenses and any other sums directly or indirectly concerned therewith) which shall be recovered from disposition of the Tract; *but this is exclusive of sums which may be or shall be recovered from disposition of the Eagson Tract referred to in paragraph 9 hereof, as to which Bank is reserving its rights and remedies* (emphasis added).

\* \* \* \* \* \*

3. (b) In the event that the foreclosure proceedings against the Tract do not produce a third party bid in an amount sufficient to satisfy the current balance due on the obligation secured by the mortgage (including but not limited to all costs, interest, fees, expenses and any other sums directly or indirectly concerned therewith), Receiver shall re-assign to Bank all of Receiver's interest of any kind or nature whatsoever in the mortgage, and in the obligation secured thereby, so as to give Bank the full, complete and absolute right to proceed in the enforcement thereof against the Eagson Tract for recovery of the deficiency or balance due thereon, as fully and completely as though the Receiver itself was acting in pursuing all of the Mortgagee's rights and remedies thereunder as Assignee of the Bank, with the result that by this re-assignment the Bank shall be restored to its position with respect to enforcement of the mortgage against the

Eagson Tract as though Bank had never assigned the mortgage to Receiver.

\* \* \* \* \* \*

9. *This Stipulation and Agreement does not include or affect in any way the rights or interests of the Bank in or with respect to the Eagson parcel of real estate more specifically described in Exhibit "C" attached hereto, concerning which a Chapter XI proceeding is pending in the United States District Court for the Eastern District of Pennsylvania, and against which Bank may continue to pursue the claim evidenced and secured by the mortgage, in those proceedings or elsewhere, as provided by law* (emphasis added).

Pursuant to this stipulation, the bank executed an assignment of its note and mortgage to the receiver.[15] The Court of Common Pleas approved the stipulation on June 11, 1979, and ordered the immediate conduct of a sheriff's sale of the Foerderer Tract, which sale was to be jointly conducted by the receiver so that it would be both a sheriff's sale and a receiver's judicial sale.[16]

On September 28, 1979, pursuant to a writ of execution which the receiver caused to be issued in enforcement of the bank's judgment, the Sheriff of Montgomery County exposed the Foerderer Tract to public sale. Pursuant to the Court of Common Pleas' June 11, 1979, order, the sale was advertised as a receiver's sale and a sheriff's sale. At this sale, the receiver, as assignee of the bank's judgment, became the successful bidder on a bid of $260,-000.00. The sheriff's sale was consummated when the Sheriff of Montgomery County conveyed the property to the receiver by deed dated November 13, 1979, and recorded on December 5, 1979.

Subsequent to the Foerderer Tract's being conveyed to her, the receiver filed a "Petition to Fix Fair Value" in the Court of Common Pleas which sought to have the fair market value of the Foerderer Tract declared to be $3,500,000.00 as of September 28, 1979, the date of the aforesaid public

---

14. *See* Exh. P–13.

15. *See* Exh. P–16.

16. *See* Exh. P–15.

sale.[17] The Court of Common Pleas approved the aforesaid petition by an order entered on June 1, 1980 (and amended on September 10, 1980).[18] The Foerderer Tract was thereafter conveyed to Harold M. Davis and Nicholas V. Martell, Co-Partners, trading as Realty Engineering Company, for $3,500,000.00.

Pursuant to the stipulation, $2,500,000.00 of the aforesaid purchase price was paid over to the bank. The remaining $1,000,-000.00 was allocated between real estate taxes owing on the Foerderer Tract and the receiver's expenses and commissions in conducting the sale. Despite the receipt of the $2,500,000.00, the bank contended that a balance of more than $2,000,000.00 was still due on its judgment, the debt having been increased by the addition of interest to $4,534,539.27 as of March 1, 1980.[19] Consequently, as provided for in the stipulation, the receiver reassigned to the bank all of her interest in the mortgage[20] since the $3,500,000.00 for which the Foerderer Tract was sold did not satisfy the bank in full. Therefore, the receiver executed an "Order to Mark to Use" transferring the bank's judgment back to it so that it could pursue its claim against the Eagson Parcel.[21] Both the reassignment and the order to mark to use were approved by the Court of Common Pleas.[22]

The history of the bankrupt's involvement in the prior state court proceedings is set forth in the opinion of the Superior Court of Pennsylvania:

Plaintiff-appellee First Pennsylvania Bank N.A. ("Bank") entered judgment by confession on August 23, 1974 against defendants Joan M. Weber, Foerderer Tract Committee, Inc. ("Committee"), Forward Lands, Inc. ("Forward"), and appellant Eagson Corporation ("Eagson") [the bankrupt], jointly and severally, in the amount of $2,805,497.14. The aforementioned defendants were signers of a note in the principal amount of $3,295,-000.00 which was dated November 6, 1972. The note was secured by a mortgage of the same date upon premises known as the "Foerderer Tract."

On September 6, 1974, Eagson filed a petition to open or strike the judgment. Depositions were taken and oral argument was heard before the court below en banc, which dismissed appellant's petition. Eagson's contentions below, as set forth in its petition and on oral argument, were that the confessed judgment was unauthorized and excessive as to it and that it had a meritorious defense to the judgment. The latter claim consisted of its allegation that it was an accommodation party to the note, having been assured that no action would be taken against it until remedies were exhausted against the principals, of a claim that it had been advised that it would be released when partial payment of the principal was made in the form of assignment of certain pledges and contributions, and of a claim that it was induced to sign the note based on the above representations. The lower court concluded that the judgment was neither unauthorized nor excessive as to Eagson. It further held that Eagson had failed to produce evidence of a meritorious defense 'which, in a jury trial would require the issues to be submitted to a jury' (citation omitted).

*First Pennsylvania Bank N.A. v. Weber,* 240 Pa.Super. 593, 595–96, 360 A.2d 715, 717 (1976).

The Superior Court then held:

The record reveals that Eagson executed the note as a co-maker together with the other co-defendants. The warrant of attorney contained in the note authorized any attorney of any court of record to appear for the signers of the note and to confess judgment against them in an amount equal to all unpaid principal and interest and all other sums due under the note and mortgage. The

---

17. *See* Exh. P–20.

18. *See* Exhibits P–21 and P–22.

19. *See* Exh. P–27.

20. *See* Exh. P–18.

21. *See* Exh. P–19.

22. *See* Exh. P–17.

**476**

warrant of attorney was properly exercised and judgment was entered on the note without irregularity.

■ Appellant's claim that the judgment entered was unauthorized and excessive as to it is based on the fact that the note provided that *after* exercising the warrant of attorney the Bank was to limit Eagson's liability on the judgment, of record, to $280,000.00. Although Eagson might have been wiser to have signed a note for $280,000.00 in the first place, or to have insisted that the warrant of attorney authorized confession of judgment against it only to the extent of $280,-000.00, we can perceive no irregularity or ambiguity in the course the parties chose, on the face thereof. The warrant clearly authorized the Bank to confess judgment against all defendants for the full amount due, *after which* it was to have the judgment index marked that Eagson and Forward's liability on the judgment was limited. The Bank has filed a praecipe to have the index so marked. Moreover, the judgment entered could not be grossly excessive as to Eagson where the Bank strictly followed the procedure set forth in the note and the authority given it by the Warrant of Attorney (citation omitted) (emphasis in original).

The judgment entered was thus neither unauthorized nor excessive and the lower court correctly denied Eagson's motion to strike (emphasis in original).

240 Pa.Super. at 597, 360 A.2d at 717, 718.

■ Notwithstanding these state court judgments,[23] the trustee urges us to look at the transactions "as a whole" and determine what the relationship of the parties were, and what their respective liabilities were and are. The essence of the trustee's position is that the bankrupt's role in the transactions in question was, in reality, more analogous to a pure surety or guaranty rather than one of a co-maker. Accordingly, the trustee argues that when the bank made its settlement with the receiver (permitting her to convey the Foerderer Tract to her purchasers free and clear of the bank's lien), it effectively released collateral to which the bankrupt, having the status of a surety or guarantor possessing a right of subrogation, would have had the right to look toward for recoupment, thereby discharging the bankrupt of any obligation to the bank. Therefore, the trustee contends that the bank is not entitled to any of the proceeds of the sale of the Eagson Parcel.[24] However, we, decline to pass on the validity of the trustee's argument because we conclude that he is collaterally estopped from relitigating the issue of the bankrupt's liability to the bank under the note and mortgage.

■ In *Matter of McMillan,* 579 F.2d 289 (3d Cir.1978), the United States Court of Appeals for the Third Circuit held that "[w]here the bankrupt or his trustee has actually litigated a suit prior to the determination of factually related issues in bankruptcy court, the collateral estoppel principle should and does apply...." *Id.* at 292,

---

**23.** Federal courts must give state court judgments the same full faith and credit that they have in the state of origin:

§ 1738. State and Territorial statutes and judicial proceedings; full faith and credit

The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

28 U.S.C. § 1738.

**24.** In a suretyship situation, it is a "recognized principle that a release of a fund or other security for satisfaction of the principal debtor's obligation discharges the surety pro tanto." *U.S. v. U.S. Fidelity & Guaranty Co.,* 35 F.Supp. 959 (E.D.Pa.1940).

293. There are at least four requirements which must be met before collateral estoppel effect can be given to a prior action: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.[25] The trustee maintains that the extent of the bankrupt's liability to the bank was not finally determined by the Superior Court of Pennsylvania because:

1. The Loan Agreement of November 6, 1972, was not before the Court [Superior Court], and it did not, therefore, have the opportunity to pass on the limiting effect of the provisions of that document when read together with the Note (240 Pa.Super. at p. 596, 360 A.2d 715).

2. The Court held that the warrant to confess judgment had been properly exercised (At p. 597, 360 A.2d 715), but that holding has no relationship to the extent of Eagson's liability.

3. The Court held that Eagson could not assert the defense that it was an accommodation maker, because that defense is available only with respect to the party accommodated (in this case, the three parties other than the Bank) (At p. 603, 360 A.2d 715). That holding, too, was unrelated to the extent of Eagson's liability to the Bank.[26]

We disagree. It cannot be disputed that the bankrupt twice litigated the issue of his liability to the bank under the note and mortgage with the result that the bankrupt's liability to the bank under those documents was initially established by the Court of Common Pleas of Montgomery County when that court denied the bankrupt's petition to strike or open the confessed judgment and that decision was determined finally by the Superior Court of Pennsylvania when that court affirmed the judgment of the Court of Common Pleas.

Consequently, despite the trustee's urging, we will not scrutinize the various loan documents (particularly, the note, mortgage and loan agreement) and make an independent determination regarding the bankrupt's liability to the bank under those documents since that issue has already been finally determined by the Superior Court of Pennsylvania. We proceed then with the understanding that the bank possesses a judgment against four parties, including the bankrupt, jointly and severally, in the amount of $2,805,497.14. Therefore the only issue left for us to determine is what amount, if any, of the proceeds resulting from the sale of the Eagson Parcel is the bank entitled to receive in light of the judgment it holds against the bankrupt.

It is the bank's position that its settlement with the receiver, from which it received $2,500,000.00, still left a balance of more than $2,000,000.00 due on its judgment, the debt having been increased by the addition of interest to $4,534,539.27 as of March 1, 1980.[27] Since said balance far exceeds the monies received from the trustee's sale of the Eagson Parcel, the bank maintains that it is entitled to all of those proceeds.

On the other hand, the trustee asserts that the bank is entitled to none of the proceeds or, in the alternative, that the bank's share of the proceeds is limited to the sum of $280,000.00. The trustee's arguments are premised on the following contentions:

1. The bankrupt received none of the proceeds of the bank's loan to the borrowers and therefore, the bankrupt's role in the transaction was analogous to that of a guarantor or a surety;

2. Under certain circumstances specified in the loan agreement the bankrupt was entitled to a subordinated participation in the note.[28]

---

**25.** *Haize v. Hanover Ins. Co.,* 536 F.2d 576, 579 (3d Cir.1976).

**26.** *See* Trustee's Reply Brief at pages 5 and 6.

**27.** *See* Exh. P–27.

**28.** Paragraph 3.5 of the loan agreement provides:

3. The bank settled its claim against the Foerderer Tract without involving the bankrupt in the settlement and the bank's failure to do so prevented the bankrupt from exercising the rights of recoupment it should have had, either based on its role in the transaction [as a surety or guarantor] or on the provisions of the loan agreement [section 3.5] thereby preventing the bankrupt from recovering $280,000.00 from the $500,000.00 fund which remained after payment to the bank and the payment of taxes ($3,500,-000.00 purchase price less $2,500,000.00 paid to the bank and $508,324.18 paid in taxes).

4. The bank has asserted on the record before the bankruptcy court that its claim is non-interest bearing and limited to $280,000.00.

For the reasons set forth earlier in this opinion, we disregard those arguments waged by the trustee based on the bankrupt's alleged status as a surety or guarantor.

With respect to the subordination rights contained in paragraph 3.5 of the loan agreement, the bank concedes that said agreement did confer subordination rights upon the bankrupt under certain circumstances even though the bankrupt was not a party to the agreement.[29] The bank contends, however, that the bankrupt never obtained any subordination rights because none of the events under which the bankrupt could have obtained those rights had occurred, i.e., the payment of $280,000.00 to the bank by the bankrupt or any other entity.

At the outset we note that, had the settlement between the bank and the receiver not occurred, and if the trustee (or anyone else) were now to pay the bank $280,000.00, it appears that the bank would have to release its lien on the proceeds of the sale of the Eagson Parcel. Further, the entity making said payment would have the right to recoup the payment out of any sale of the Foerderer Tract. The trustee, however, maintains that the reason why the bankrupt did not acquire the subordination rights was because the bank failed to inform the bankrupt or the trustee (then a Chapter XI receiver) of the terms of the proposed settlement with the receiver and the borrowers as a result of which the bankrupt and/or trustee lost the opportunity to pay the bank and obtain the subordination rights so that when the receiver sold the Foerderer Tract for $3,500,000.00, the trustee could have recouped the $280,000.00 from the proceeds of that sale. In essence, the trustee contends that when the bank made its settlement with the borrowers and permitted the receiver to convey the Foerderer Tract to her purchasers free and clear of the lien of the mortgage, it effectively released or gave away collateral (the Foerderer Tract) to which the bankrupt and/or the trustee would have had the right to look for recoupment after paying the $280,000.00 to the bank. In short, the trustee argues that the receiver's conveyance of the Foerderer Tract free and clear of the bank's mortgage has rendered paragraph 3.5 of the

3.5 The parcel of the Foerderer Tract owned by Eagson Corporation at the date of this Agreement (hereafter called the 'Eagson Tract' and described in Exhibit 'D' attached hereto) shall be released from the lien of the Mortgage prior to the final repayment of the loan amount in accordance with this Agreement and the terms of the Note if either (1) Eagson Corporation pays to Bank the sum of $280,000 in reduction of the loan or (2) payments of $280,000 in reduction of the loan are made to Bank by Borrower or others in excess of those payments required to be made to Bank under Section 3.3. If, because of a default of Borrower, Bank begins foreclosure proceedings against the property subject to the lien of the Mortgage, and if subsequent to the start of such proceedings a sum equal to the unpaid balance of the $280,000 payment referred to in (2) of the preceding sentence is made to Bank in order to obtain a release of the lien of the Mortgage from the Eagson Tract, the Bank will give to the party so paying such sum a subordinated participation in the Note (to the extent of the payment so made); the payment of such sum for such purpose shall not be applied by Bank in reduction of the loan, but shall be retained by Bank for its own account. . . .
See Exh. P–4.

29. See the bank's trial memorandum at page 15.

loan agreement totally useless so far as the trustee is concerned.[30] As a result, the trustee maintains that the bankrupt should be released of any obligation to the bank and the bank should be denied any portion of the proceeds of the sale of the Eagson Parcel.

While the trustee's argument appears to have some merit, we must nevertheless reject it because the trustee has simply failed to prove that the bank did not inform the bankrupt of the terms of the settlement or that the bankrupt was not otherwise aware of it. If anything, the record seems to establish that the bankrupt had ample opportunity to take advantage of its subordination rights—the loan in question went into default in 1974, some five years prior to the settlement; the bank confessed judgment against the bankrupt in 1974; the bank instituted foreclosure proceedings against the bankrupt; the bank sought relief before us to proceed with foreclosure; the bankrupt's president lived within the Foerderer Tract on the Eagson Parcel. Moreover, while neither the bank nor the receiver presented the stipulation to us for approval, the trustee has not demonstrated in any manner whatsoever that our approval was required nor has the trustee argued that the settlement is void as a result thereof.[31] Consequently, we conclude that the trustee's reliance on paragraph 3.5 of the loan agreement is misplaced.

We will, however, take judicial notice of the "Complaint to Sell Real Property at Public Sale Free and Clear of Liens and Encumbrances," filed by the trustee on March 25, 1980, in which the bank was the first-named defendant; more particularly, paragraph two thereof, and the corresponding paragraph of the bank's answer thereto:

Complaint, ¶ 2.

2. Defendant FIRST PENNSYLVANIA BANK, N.A., is the holder of a mortgage dated November 6, 1972, against certain real property titled in the name of Eagson Corporation at 1020 Mt. Pleasant Avenue, Bryn Mawr,.Pennsylvania ("LaRonda property") [the Eagson Parcel], *securing a noninterest-bearing claim in the sum of $280,000.00,* and is also the holder of a judgment against Eagson Corporation filed in the Common Pleas Court of Montgomery County on August 23, 1974, securing the same claim (emphasis added).

Answer, ¶ 2.

2. Admitted.

We are well-aware of the general rule enunciated by the United States Court of Appeals for the Third Circuit in *In re Aughenbaugh,* 125 F.2d 887 (3d Cir.1942), that the only evidence which we may consider in resolving a contested matter is evidence formally introduced by the parties at the hearing on that matter.[32] In *Aughenbaugh,* the court stated:

We may not consider other evidence which may have been in the files of the referee in the bankruptcy administration proceeding. To hold otherwise would be to violate the fundamental concept of procedural due process that a party to litigation is entitled to have the evidence relied on by his opponent presented at the hearing of his case so that he may have opportunity to cross-examine his opponent's witnesses and to offer evidence in rebuttal.

125 F.2d at 887.

We are likewise cognizant of a later decision of the Third Circuit, which makes reference to *Aughenbaugh, supra,* wherein the Court expressly noted that:

parties (the bank and the receiver) not subject to our jurisdiction.

---

**30.** In his reply brief, however, the trustee suggests that he is still able to take advantage of the provisions of paragraph 3.5 of the loan agreement, whether he makes payment voluntarily or pursuant to an order of this court. *See* Trustee's Reply Brief at page 12.

**31.** Ostensibly, (although it is far from clear) the stipulation involved a settlement between two

**32.** We have applied the Aughenbaugh, rule in matters before us. *See Goldberger v. Horan (In re Traffic Safety Co., Inc.),* 21 B.R. 669 (Bkrtcy.E.D.Pa.1982); *In re Ratmansky,* 7 B.R. 829 (Bkrtcy.E.D.Pa.1980).

The concept of judicial notice has long been recognized and understood, and its functions and effects have been appraised in learned dissertations. We are here dealing with a particular aspect of the doctrine, its application to the Court's own records. It is stated to be the general rule that courts will not travel outside a record in order to notice proceedings in another case, even between the same parties to the same court, unless the proceedings are put in evidence (citations omitted). The rule has received a strict construction (citations omitted). *However, exceptions are admitted, and it may indeed be more appropriate to say that the extent to which the doctrine will be applied depends to a large degree upon considerations of expediency and justice under the particular circumstances of a case, as well as upon what it is that a court is asked to notice* (citation omitted) (all footnotes omitted) (emphasis added).

*Funk v. Commissioner of Internal Revenue Service,* 163 F.2d 796 (3d Cir.1947).

On March 25, 1980, the trustee instituted the original complaint to sell the Eagson Parcel at a public sale, naming the bank and all the other defendants in the instant case as defendants thereon. We entered judgment on the original complaint by an order dated May 5, 1980, wherein we provided that all the lienholders would be relegated to the proceeds of the sale. In the usual course, the bank's claim, as well as those of the other lienholders, would have been dealt with in the context of the trustee's adversary proceeding. For whatever reason, the bank instituted a second adversary proceeding (the instant case) to assert its claim to the proceeds. We think this situation falls squarely within the rationale of *Funk, supra.* In the case *sub judice,* we perceive no injustice in taking judicial notice of the aforementioned pleadings of the trustee's original adversary proceeding since the two actions involve the identical parties and subject matter and both deal exclusively with the distribution of the proceeds of the sale of the Eagson Parcel. The instant adversary proceeding is not, in reality, a case that is separate and distinct from the trustee's original action.

In any event, we need not rely entirely on *Funk, supra;* instead, we refer to Exhibit P–25, which was offered into evidence (and admitted) in *this* case by the bank, wherein the bank's counsel concedes:

The other point, Your Honor, is that in the event the company is not adjudicated at this time, I wish you would consider the situation in which First Pennsylvania Bank finds itself, which is substantially different from the position of the other secured creditors. We had a cap on the amount of money we can receive, so we are not obtaining interest.[33]

\* \* \* \* \* \*

I can't speak for all of the secured creditors, but my client is a secured creditor who is injured as time goes by, and the reason is the amount we are entitled to be paid, this is First Pennsylvania Bank, the amount we are entitled to be paid, $280,000, is fixed. There is no interest accruing on that and we sit here, not able to have the $280,000 and not able to proceed against the property.[34]

The bank downplays the significance of the aforesaid statements and simply contends that we should disregard them because: (1) they were made several years ago when the issue before us was whether to continue the Chapter XI proceedings and maintain the stay against the sheriff's sale of the Eagson Parcel; and (2) they reflect an assumption on the bank's part that the trustee would, at some future time, try to limit the bank's recovery to $280,000.00. We initially note that one of the statements in question (that the bankrupt's obligation to the bank was non-interest-bearing) was made at the hearing on the trustee's com-

---

33. *See* Exh. P–25 at page 1062 (hearing under § 376(2) of the Act, 8/15/78).

34. *See* Exh. P–25 at page 1362 (hearing under § 376(2) of the Act 5/31/79).

plaint to sell the Eagson Parcel.[35] As to the other statements, to accept the bank's contention would, in effect, require us to reach the conclusion that so long as the bankrupt was a Chapter XI debtor, the bank's claim was limited to $280,000.00, but that this would no longer be the case in a bankruptcy context. Nor can we believe, as we would have to if we accepted the bank's position, that what the bank's counsel was really saying was not that the bank's claim was limited to $280,000.00, but that he was simply anticipating that the trustee would so contend.

Consequently, on the basis of the statements made by the bank's counsel in the various hearings before us and the bank's admission in its answer to the trustee's complaint to sell free and clear, we find that the bank has a noninterest-bearing claim against the bankrupt in the amount of $280,000.00. Accordingly, we conclude that the bank has a claim against the proceeds of the sale of the Eagson Parcel in the amount of $280,000.00.[36]

**35.** At the hearing on the trustee's complaint to sell the Eagson Parcel, counsel for the bank advised the court as follows:

> Your Honor, this forces me to make [sic] statement, and that is that we have been trying to get control of this property and finish our foreclosure for over two years, and we have an obligation that is not interest-bearing.

*See* notes of testimony, 5/5/80, at page 1796. If unequivocal and made within the scope of his authority, statements made by an attorney during the course of a trial are considered judicial admissions binding upon the attorney's client. *See Glick v. White Motor Co.,* 458 F.2d 1287 (3d Cir.1972); *Rhoades, Inc. v. United Air Lines, Inc.,* 340 F.2d 481 (3d Cir.1965); *Childs v. Franco,* 563 F.Supp. 290 (E.D.Pa.1983); *Taylor v. Allis-Chalmers Manufacturing Co.,* 320 F.Supp. 1381 (E.D.Pa.1969), *aff'd* 436 F.2d 416 (3d Cir.1970).

**36.** The trustee additionally contends that the bank should be charged with a reasonable portion of the expenses of the sale of the Eagson Parcel as well as the costs of administration of the bankrupt's estate. However, when the sale of secured assets (the Eagson Parcel) is in lieu of foreclosure, only those expenses directly related to preserving the property and the expenses of the sale can have priority over the lien of the secured creditor. When the secured creditor does not consent to a sale of assets, administrative expenses have no priority over the secured creditor's lien. *See In re Universal Minerals, Inc.,* 25 B.R. 799 (Bkrtcy.W.D.Pa. 1982). Consequently, we will deny the trustee's request that the bank be charged with administrative expenses but we will, however, grant the trustee's request that the bank be charged with its share of the expenses of the sale of the Eagson Parcel.