832 F.2d 601
 266 U.S.App.D.C. 1
 VEG-MIX, INC., Petitioner,
v.
U.S. DEPARTMENT OF AGRICULTURE and United States of America,
Respondents.
KUZZENS, INC., Petitioner,
v.
U.S. DEPARTMENT OF AGRICULTURE and United States of America,
Respondents.
Charles M. HARRIS, Petitioner,
v.
U.S. DEPARTMENT OF AGRICULTURE and United States of America,
Respondents.
 Nos. 85-1771, 86-1201, 86-1202.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 3, 1987.
Decided Oct. 30, 1987.
 
 Alexander J. Pires, Jr., with whom John M. Himmelberg and Jeffrey A. Knishkowy, Washington, D.C., were on the brief, for petitioners.
 Aaron B. Kahn, U.S. Dept. of Agriculture, Washington, D.C., for respondents. James Michael Kelly, Associate Gen. Counsel, Raymond W. Fullerton, Asst. Gen. Counsel and Thomas D. Edmondson, U.S. Dept. of Agriculture, Washington, D.C., were on the brief, for respondents.
 Before MIKVA, STARR and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 Opinion dissenting in part and concurring in part filed by Circuit Judge MIKVA.
 WILLIAMS, Circuit Judge:
 
 
 1
 The Perishable Agricultural Commodities Act ("PACA") attempts to facilitate interstate commerce in fresh fruits and vegetables. 7 U.S.C. Sec. 499a et seq. (1982 & Supp. III 1985). To help instill confidence in parties dealing with each other on short notice, across state lines and at long distances, it provides special sanctions against dishonest or unreliable dealing. In the cases before us, the sanctions provided evidently failed to deter one merchant, and the Department of Agriculture launched its enforcement machinery. The main culprit having disappeared, it proceeded against lesser lights, with results that we do not find fully in conformity with the law.
 
 
 2
 PACA makes it unlawful for certain merchants of fresh fruits and vegetables to fail to pay fully and promptly for their purchases. 7 U.S.C. Sec. 499b(4). It allows the Secretary of Agriculture to revoke the licenses of those whose offenses are "flagrant or repeated." Id. Sec. 499h(a). Persons "responsibly connected" to such a violator may be barred from a PACA license for two years and from employment with any licensee for a year. Id. Secs. 499a(9), 499d(b), 499h(b).
 
 
 3
 Our decision covers three connected cases. In No. 85-1771, petitioner Veg-Mix, Inc., challenges the Secretary's determinations of flagrant and repeated PACA violations, and in Nos. 86-1201 and 86-1202, petitioners Kuzzens, Inc., and Charles M. Harris challenge orders finding them to be responsibly connected with Veg-Mix. For the reasons given below, we remand the Veg-Mix decision (No. 85-1771) for a limited factual determination, affirm in Kuzzens (No. 86-1201), and remand in Harris (No. 86-1202).
 
 I. BACKGROUND
 
 4
 Veg-Mix was a fruit and vegetable business conceived by William Lipman (acting on behalf of Kuzzens) and Larry Watkins, who was to become its president and part owner, and whose manipulations and ultimate disappearance are at the root of these cases. Early in September 1982 Watkins and Kuzzens entered into a preincorporation agreement, and articles of incorporation were filed with the Florida Secretary of State that same month. Shortly thereafter, Veg-Mix obtained a PACA license.
 
 
 5
 By the terms of the preincorporation agreement, Kuzzens invested $30,000 directly ($12,000 in exchange for equity, $18,000 for debt) and lent Watkins $20,000 for him to invest; Kuzzens was to own 60 percent and Watkins 40 percent. The agreement obliged Watkins to "devote his undivided time and attention and use the utmost of his skills and ability to the furtherance of the Corporation" and gave him complete management authority over day-to-day affairs, subject to review by the board of directors.
 
 
 6
 The directors designated in both the agreement and the articles of incorporation were Watkins, Wayne M.D. Press, and Charles M. Harris. Press and Harris were relatives of William Lipman and salesmen for Six L's Packing Company, another enterprise owned in part by the Lipman family and operating in the same offices as Kuzzens, Inc. William Lipman originally designated Press and Harris as directors without their knowledge, although Harris, a lawyer, learned of his directorship when Lipman directed him to prepare the articles of incorporation. No scheduled directors' meetings, shareholders' meetings, or other corporate formalities were observed during Veg-Mix's single season of operations, from November 1982 to late May or early June 1983.
 
 
 7
 In March 1983, Watkins offered to buy Kuzzen's interest in Veg-Mix for $100,000. Lipman and Watkins shook hands in agreement on the deal, but they never prepared or signed a written agreement and Watkins never paid up. Though the sales agreement remained executory, it led to the resignations of Press and Harris either in late March or early April, as we shall see in more detail in reviewing the "responsibly connected" findings.
 
 
 8
 At the end of the marketing season, in late May or early June 1983, Veg-Mix ceased merchant operations. (Bookkeeping activity continued.) Kuzzens officials discovered in October 1983 that Watkins had written checks on Veg-Mix's accounts without proper authorization. Watkins himself had by this time disappeared. The Kuzzens representatives took steps to staunch the flow of funds, temporarily re-involving Press and Harris in Veg-Mix's affairs. In March 1984 a bankruptcy petition was filed on Veg-Mix's behalf. The petition was prepared by lawyer who examined Veg-Mix documents, Joint Appendix ("J.A.") B-385-86, and was signed by Paula Berry, as Secretary, for Veg-Mix. The petition listed Harris and Press as directors and Kuzzens and Watkins as shareholders.
 
 
 9
 The Agriculture Department's Agricultural Marketing Service, Fruit and Vegetable Division filed an administrative complaint in August 1984 alleging that Veg-Mix violated 7 U.S.C. Sec. 499b(4) during the February-July 1983 period by failing to make full, prompt payment of agreed purchase prices for 50 lots of fruits and vegetables in interstate commerce. The total sum asserted was $191,306.60, owed to six sellers. J.A. B-387. It further alleged that these failures were willful, flagrant, and repeated, and thus it requested publication of the relevant facts and circumstances pursuant to 7 U.S.C. Sec. 499h(a). (The de-licensing remedy of Sec. 499h(a) was moot because Veg-Mix had already lost its license for failure to pay the required annual fee.) Also in August, the agency notified Harris, Press, Kuzzens, and others of a preliminary determination that they were "responsibly connected" with Veg-Mix.
 
 
 10
 After various delays, the administrative law judge ("ALJ") issued a dispositive order against Veg-Mix. In re Veg-Mix, Inc., PACA Docket No. 2-6612 (June 26, 1985). Veg-Mix appealed unsuccessfully to a judicial officer and then, equally unsuccessfully, petitioned for reconsideration. Meanwhile, the cases of Kuzzens and Harris were considered in a consolidated hearing on May 22, 1985. In In re Kuzzen's [sic], Inc., PACA RC 84-1022 (September 27, 1985) and In re Harris, PACA RC 84-1024 (September 30, 1985), the presiding officer determined that both were responsibly connected with Veg-Mix during the period at issue. Soon afterwards the same officer found Press not so connected. In re Press, PACA RC 84-1023 (October 16, 1985). The administrator of the agricultural marketing service summarily affirmed the Kuzzens and Harris decisions on February 6, 1986.
 
 II. VEG-MIX'S CLAIMS
 
 11
 Veg-Mix challenges the agency's determination on several grounds. First, it claims that the ALJ should not have considered the bankruptcy pleadings and invoices that formed the principal documentary evidence. Second, it contends that it was wrongly denied an evidentiary hearing, in violation of the agency's procedural rules and in the face of material factual disputes. Third, it claims that the judicial officer erred by insufficiently addressing the issues Veg-Mix raised in its appeal and in not admitting newly discovered evidence. We disagree with all these contentions.
 
 A. The Invoices and the Bankruptcy Petition
 
 12
 The strongest evidence against Veg-Mix consisted of 50 invoices from transactions which the agency contended had not been fully and promptly paid. Veg-Mix contends that the ALJ should not have considered these. The business records exception to the hearsay rule ordinarily requires "the testimony of the custodian or other qualified witness." Fed.R.Evid. 803(6). As that was not offered, Veg-Mix argues, the invoices lacked authentication.
 
 
 13
 Laxer standards of admissibility, however, apply to administrative tribunals. See, e.g., 3 K. Davis, Administrative Law Treatise Sec. 16.5 (1980). Generally, for example, if hearsay evidence meets the standards of the Administrative Procedure Act by being relevant, material, and unrepetitious, see 5 U.S.C. Sec. 556(d) (1982), agencies are entitled to weigh it according to its "truthfulness, reasonableness, and credibility," see Johnson v. United States, 628 F.2d 187, 190-91 (D.C.Cir.1980); see also National Association of Recycling Industries, Inc. v. Federal Maritime Commission, 658 F.2d 816, 825 (D.C.Cir.1980) (finding agency's disregarding of probative hearsay evidence to be arbitrary and capricious).
 
 
 14
 This case is not one for testing the outer limits of these more permissive rules. Veg-Mix stresses the agency's purported technical error, rather than the truthfulness of the invoices. Brief for Petitioner at 28-32. In the absence of a serious, nonspeculative argument that the records were something other than they appeared to be, the practical standards applicable to administrative proceedings are not offended.
 
 
 15
 Veg-Mix makes a similarly technical objection with regard to the ALJ's taking official notice of Veg-Mix's bankruptcy petition. The bankruptcy petition listed debts that generally corresponded to the debts shown by the sales invoices. The papers were signed by Paula Berry, as Secretary of Veg-Mix, who was required to "certify under penalty of perjury" that the information was "true and correct to the best of [her] knowledge, information, and belief." Respondent's Appendix 57-63. Veg-Mix argues that because affidavits submitted under Fed.R.Civ.P. 56(e) must be made "on personal knowledge," the bankruptcy pleadings--which by Berry's statement may have rested on mere "information and belief"--should have been excluded. Whatever merit the claim might have in a more formal civil litigation context, it has none in informal administrative proceedings.
 
 
 16
 The agency's rules provide that "[o]fficial notice shall be taken of such matters as are judicially noticed by the courts of the United States...." 7 C.F.R. Sec. 1.1141(g)(6) (1987). Courts may take judicial notice of official court records, including bankruptcy pleadings. See, e.g., Freshman v. Atkins, 269 U.S. 121, 123-24, 46 S.Ct. 41, 42, 70 L.Ed.2d 193 (1925); In re Aughenbaugh, 125 F.2d 887, 890 (3d Cir.1942); In re Eagson Corp., 37 B.R. 471, 479-80 (Bankr.E.D.Pa.1984). Indeed, this court has observed, "[I]t is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties." Fletcher v. Evening Star Newspaper Co., 133 F.2d 395, 395 (D.C.Cir.1942), cert. denied, 319 U.S. 755, 63 S.Ct. 1163, 87 L.Ed. 1708 (1943). Accord Hart v. Commissioner, 730 F.2d 1206, 1207-08 n. 4 (8th Cir.1984); Green v. Warden, U.S. Penitentiary, 699 F.2d 364, 369 (7th Cir.), cert. denied, 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); St. Louis Baptist Temple, Inc. v. Federal Deposit Insurance Corp., 605 F.2d 1169, 1172 (10th Cir.1979). The agency has previously indicated, albeit in dictum, that it will take official notice of bankruptcy petitions. In re Fava & Co., PACA Docket No. 2-6547 (Dec. 4, 1984) [43 Agric.Dec. _______].
 
 
 17
 Veg-Mix invokes In re Aughenbaugh, 125 F.2d 887 (3d Cir.1942), in which the Third Circuit examined a district court's reliance on information in a bankruptcy referee's files. The court of appeals found fault with the district court's reliance on evidence not properly introduced before the bankruptcy referee or the district court.
 
 
 18
 Aughenbaugh appears to rest on a vulnerability in classic judicial notice: that it may operate without parties having a chance to identify defects or to explain away apparent implications. No such problem exists here, as Veg-Mix knew that the agency was offering the bankruptcy proceedings and thus had ample opportunity to respond. Indeed, even now Veg-Mix's position rests only on the supposed technical deficiency. Although it contested the inferences naturally to be drawn from the bankruptcy petition and invoices, the data it offered in support did not truly draw them in question, as we shall shortly see.
 
 B. The Failure to Hold a Hearing
 
 19
 1. Agriculture Department Requirements. Agriculture Department rules dispense with a hearing when no answer is filed, 7 C.F.R. Sec. 1.139 (1987),[1] and Veg-Mix would have us infer from this that under every other circumstance a hearing must occur, regardless of the nonexistence of material factual disputes. Since Veg-Mix answered the complaint with a denial of the allegations that some of the transactions were in interstate commerce and denials that some of the transactions were accurately described, it contends that a hearing was required.
 
 
 20
 This argument strikes us as an utterly implausible application of the ancient maxim expressio unius est exclusio alterius. Common sense suggests the futility of hearings where there is no factual dispute of substance. Moreover, the agency has previously held that obviously meritless denials and affirmative defenses do not require a PACA hearing, and it placed the burden on the respondent to show a substantial issue requiring a hearing. In re Fava & Co., 44 Agric.Dec. 870 (1985).
 
 
 21
 The Department's view in Fava accords with our rulings that an agency may ordinarily dispense with a hearing when no genuine dispute exists. See Citizens for Allegan County, Inc. v. Federal Power Commission, 414 F.2d 1125, 1128 (D.C.Cir.1969) (Leventhal, J.) ("the right of opportunity for hearing does not require a procedure that will be empty sound and show, signifying nothing"). In Community Nutrition Institute v. Young, 773 F.2d 1356, 1364 (D.C.Cir.1985), cert. denied, 475 U.S. 1123, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986), we suggested that a "request for a hearing must contain evidence that raises a material issue of fact on which a meaningful hearing might be held." See also Cerro Wire & Cable Co. v. Federal Energy Regulatory Commission, 677 F.2d 124, 128-29 (D.C.Cir.1982). Thus we think the agency's approach on the general issue of when a hearing is required was unexceptionable. We therefore turn to the question of whether Veg-Mix raised a material issue of fact.
 
 
 22
 2. Possible Genuine Disputes. The agency presented evidence with its motion for decision--the invoices, the bankruptcy petitions, and two affidavits by agency investigators--strongly suggesting numerous PACA violations. We think that the agency satisfied its initial burden with this evidence. Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (describing genuine dispute in civil action as one in which "a reasonable jury could return a verdict for the nonmoving party"); Celotex Corp. v. Catrett, 477 U.S. 417, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (describing burden of party seeking summary judgment in a civil action). It was thus incumbent on Veg-Mix to come forward with evidence rebutting this showing. See In re Fava & Co., 44 Agric.Dec. 870 (1985). Cf. Anderson, 106 S.Ct. at 2510 (in the face of a properly supported motion for summary judgment, nonmoving party may not rest on allegations in pleadings but must come forward with significant probative evidence); Celotex Corp., 106 S.Ct. at 2553-54 (same).
 
 
 23
 Veg-Mix, however, chose not to exercise its right under the agency's regulations to oppose the agency's motion for decision. All that it presented in its defense was what it styled a Request for Issuance of Subpoenas Duces Tecum to compel the appearance of nine individuals to testify at a hearing. (In fact, as both sides now agree, Veg-Mix was seeking subpoenas ad testificandum.)[2]
 
 
 24
 This submission placed great stress on the nefarious character of the missing Watkins, and suggested that the accuracy of the records and bankruptcy pleadings could not be assessed in his absence. It included exhibits suggesting that Watkins had composed false Veg-Mix invoices in order to benefit himself or had had Veg-Mix billed by other companies in his control. J.A. B-17, 22 (Affidavit of James P. Doherty), J.A. B-30 (Affidavit of Jack Rosenthal). Veg-Mix now argues that this information of Watkin's dishonesty casts doubt on the accuracy of the bills to Veg-Mix from independent firms.
 
 
 25
 The logic of this escapes us. The exhibits suggest various devices by Watkins for raiding Veg-Mix. But in the absence of some reason to believe that Watkins had somehow manipulated the firms whose bills are at issue--and even now no such thing is suggested--the items do not undermine the apparent significance of the invoices before the ALJ. As the Court in Anderson noted, once a moving party has satisfied its burden, "[i]f the evidence [offered by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." 106 S.Ct. at 2511 (citations omitted). Here the submissions by Veg-Mix were not substantial enough to create a genuine dispute requiring a hearing.
 
 C. Objections to the Administrative Appeal
 
 26
 Veg-Mix appealed the ALJ's decision to the judicial officer, who found no error and adopted the ALJ's decision. It then petitioned for reconsideration and sought to submit new evidence. Veg-Mix now claims two errors. Although both are meritless, we remand for the agency to decide whether Veg-Mix's violations reached the "flagrant or repeated" level before Harris ceased to be "responsibly connected" to the firm.
 
 
 27
 1. Reliance of the Judicial Officer on the ALJ's opinion. The judicial officer affirmed on the basis of the ALJ's opinion and Veg-Mix argues that this conduct breached the agency's duty to explain its actions. See, e.g., Harborlite Corp. v. Interstate Commerce Commission, 613 F.2d 1088, 1092-93 (D.C.Cir.1979). So long as the explanations offered by the lower administrative level are adequate--and Veg-Mix doesn't claim otherwise--obviously the practice here is a sensible fulfillment of the duty to explain. Cf. Martino v. Dept. of Agriculture, 801 F.2d 1410, 1412 (D.C.Cir.1986). It happens, in fact, to be expressly authorized by the Agriculture Department's regulations.[3]
 
 
 28
 2. Refusal to consider new evidence. Veg-Mix also argues that the judicial officer should have granted its request to reopen the proceedings to consider new evidence. This consisted of an affidavit from Gary Syracuse relating to the earliest transactions at issue, in which Veg-Mix was alleged to owe $12,360.70 to Syracuse and Jenkins Produce, Inc. The affidavit said that the amounts shown on the invoices from February and March 1983 were in dispute until May 1983. Veg-Mix concedes that exoneration on these transactions would not render its violations de minimis, Brief for Petitioner at 39, but argues that the evidence casts doubt on the validity of the other invoices and may exculpate some of the "responsibly connected" parties.
 
 
 29
 In rejecting these arguments, the judicial officer relied on the agency's rule on petitions to reopen hearings, which requires that such petitions be filed "prior to the issuance of the decision by the Judicial Officer." 7 C.F.R. Sec. 1.146(a)(2) (1987). Veg-Mix did not meet that deadline.
 
 
 30
 Veg-Mix argues that this rule does not apply: given the summary judgment, there was no "hearing" to reopen. We think the agency could properly read the rule as applying to summary proceedings. No regulation specifically addresses the subject of petitions to reopen summary proceedings. To adopt Veg-Mix's view might mean either that no reopenings of summary proceedings were permitted or that there are no limitations on petitions to reopen. Neither of these outcomes would be sensible. On the other hand, the limitations provided in Sec. 1.146(a)(2)--requirements that the petitioner raise the matter of new evidence before a final decision has issued, show why such evidence is significant, and give a good reason for late filing--make quite as much sense in a challenge to a summary proceeding as in a challenge to a hearing.
 
 
 31
 The application of the rule here clearly was not unfair. Veg-Mix had some four months to gather evidence before the deadline to respond to the agency's motion for decision before the ALJ, and about two more months before the judicial officer's decision. It has not provided any explanation for its failure to offer the Syracuse affidavit sooner. We do not think the judicial officer erred in refusing to accept the evidence.
 
 
 32
 We nevertheless remand the case for a single factual determination. As developed in the next part, only the Syracuse and Jenkins transactions occurred before the end of petitioner Harris's association with Veg-Mix. Instead of evaluating these few transactions ourselves to determine whether standing alone they qualify as "flagrant or repeated" violations, we return the issue to the agency. See Securities and Exchange Commission v. Chenery, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). As we understand the relevant regulations, the agency is not barred from considering the untimely evidence drawing the status of the Syracuse and Jenkins transactions in question, and it may well wish to do so.[4]III. CLAIMS OF KUZZENS AND HARRIS
 
 
 33
 PACA is relatively clearcut in identifying the persons subject to sanction because of their link to a PACA violator. Under 7 U.S.C. Sec. 499a(9), " 'responsibly connected' means affiliated or connected with a commission merchant, dealer, or broker as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association." As previously noted, the agency alleged that Charles M. Harris, Wayne M.D. Press, as directors, and Kuzzens, Inc., as a 60 percent shareholder, were responsibly connected to Veg-Mix. After a joint hearing, the presiding officer issued three separate opinions, finding that Harris and Kuzzens were responsibly connected but that Press was not.
 
 
 34
 Harris and Kuzzens, Inc., challenge the adverse findings on the grounds that piercing the corporate veil was appropriate in these circumstances. We reject these claims. They also invoke prior decisions of this court tightening the requirements for a finding of responsible connection, but we find those decisions inapplicable here. We therefore conclude that Kuzzens was responsibly connected, as owner of 60 percent of Veg-Mix's stock. But as Harris resigned as a director of Veg-Mix prior to the bulk of the transactions at issue, we remand his case for further consideration.
 
 A. Veg-Mix's Legal Status
 
 35
 Harris and Kuzzens assert that under Quinn v. Butz, 510 F.2d 743 (D.C.Cir.1975) (Robinson, J.), the agency was obliged to pierce the corporate veil of Veg-Mix and exonerate them. In Quinn, the court indicated a willingness to engage in veil piercing when necessary to prevent injustice to a mere employee of a PACA violator. No sensible reading of Quinn will aid petitioners. Cf. Martino v. Dept. of Agriculture, 801 F.2d 1410, 1414 n. 46 (D.C.Cir.1986) (Robinson, J.) ("Quinn required no more than that petitioners receive 'an opportunity to show that the company was not in truth a corporation within the objective that Congress contemplated.' ") (quoting Quinn, 510 F.2d at 760). Quinn involved an employee of a sole proprietorship who was asked by the owner to become a vice president when the owner converted the business to a corporation. The employee's officership was purely nominal; it was conferred by the owner to meet a state corporation law requirement and involved no change in duties. The original proprietor continued to have exclusive control of the business.
 
 
 36
 Kuzzens, Inc., by contrast, was a majority shareholder of Veg-Mix, not a powerless employee. There is no injustice analogous to that in Quinn in holding such a party accountable for PACA violations. As for Harris, he was a lawyer by training, and thus presumably aware of the responsibilities of corporate directors. He accepted a directorship in Veg-Mix and even helped in the preparation of the corporate documents. Unlike the employee in Quinn, he was not directly or indirectly accountable to the proprietor of the transgressing business. In short, there is no indication that he was a helpless pawn who could not in good conscience be held accountable as a bona fide director. Thus we do not think that the presiding officer erred in refusing to apply Quinn.[5]B. The Evidence of Responsible Connection
 
 
 37
 Our decisions have read Sec. 499a(9) as establishing only a rebuttable presumption that an officer, director, or large shareholder of a PACA violator is responsibly connected. Quinn, 510 F.2d at 756; Minotto v. Department of Agriculture, 711 F.2d 406, 408 (D.C.Cir.1983). The Quinn court suggested that one who was an officer "only on paper" and both "unaware of the wrongdoing [and] powerless to curb it," 510 F.2d at 755, could not be held responsibly connected under PACA. The court required the agency to consider the issue at a hearing. Similarly, in Minotto, the court found that a clerical employee designated as a corporate director was not automatically responsibly connected under PACA. The court articulated a loose fault concept, saying that "[a] finding of liability under section 499h of the Act must be premised upon personal fault or the failure to 'counteract or obviate the fault of others.' " Id. at 408 (quoting Quinn, 510 F.2d at 756).[6]
 
 
 38
 We apply the standard of these cases, but find it unavailing for Kuzzens and unnecessary for Harris.
 
 
 39
 1. Kuzzens, Inc. The analogy to Quinn and Minotto is weakest here. Neither case involved shareholders, although Minotto suggests in dictum that the same rule applies to them. 711 F.2d at 408. In any event, a majority shareholder, such as Kuzzens, can hardly be viewed as powerless to control delinquent management, as the petitioners in Quinn and Minotto arguably were. As we indicated in Martino v. Dep't of Agriculture, 801 F.2d 1410, 1414 (D.C.Cir.1986), the crucial inquiry is whether an individual has an "actual, significant nexus with the violating company," rather than whether the individual has exercised real authority. In Martino, we found that ownership of 22.2 percent of the violating company's stock was enough support for a finding of responsible connection. Majority ownership obviously suffices.
 
 
 40
 Apart from its reliance on Quinn and Minotto, Kuzzens argues that it either was never a stockholder or sold its interest before the majority of the transactions at issue. Neither of these contentions withstands analysis.
 
 
 41
 In arguing that it never became a shareholder, Kuzzens states that no executed stock certificate was issued to it. We are puzzled by this contention. A stock certificate for twelve shares of Veg-Mix, Inc., issued to Kuzzens, Inc., is part of this record. Even if there is some technical inadequacy in the certificate, on the facts here it would matter little, since the preincorporation agreement and bankruptcy pleadings both list Kuzzens as 60 percent shareholder, and the former clearly recites the consideration of $12,000. Moreover, one can be a shareholder without a stock certificate having been physically issued. 11 L. Zajdel, Fletcher Cyclopedia of the Law of Private Corporations Sec. 5094 (1986). Substantial evidence thus supports the finding that Kuzzens was a 60 percent shareholder.
 
 
 42
 Kuzzens is more energetic, but no more persuasive, in arguing that it sold its interest to Watkins in late March 1983, before most of the offending transactions took place. William Lipman, vice-president of Kuzzens, testified that he agreed to sell Kuzzens's interest to Watkins, but said that this agreement was never reduced to a writing. Under Florida law a contract for a sale of securities is generally unenforceable unless it is in writing and signed by the party against whom enforcement is sought. Fla.Stat.Ann. Sec. 678.8-319 (West 1966). No claim is made that any exception to the Florida Statute of Frauds applies, and, even if the contract were binding, Kuzzens regarded it as executory throughout the relevant transactions here. When it was discovered in October 1983 that Watkins was writing checks for his personal purposes on Veg-Mix's account, Lipman directed employees of Six-L's (an enterprise with some of the same management and the same office space as Kuzzens) to protect Veg-Mix's assets. When an attorney for Watkins sought corporate documents from Kuzzens, Geoffrey Fradin (a Six-L's employee) refused to turn them over, stating that he would not do so until the purchase price was paid. J.A. B-145-46. Finally, Kuzzens is listed as a shareholder on the bankruptcy petition. Substantial evidence supports the finding that there was no completed sale.[7]
 
 
 43
 2. Harris. Harris likewise argues that his association with Veg-Mix was merely nominal, and thus insufficient to support a finding of responsible connection under Quinn and Minotto. Harris is a lawyer by training. William Lipman selected him as a director of Veg-Mix and secured his help in drafting the Veg-Mix articles of incorporation. These named him as a director, along with Watkins and Press. His legal training put him on notice of the responsibilities of a corporate director. If he was aware of the preincorporation agreement, he would have recognized that it left Watkin's authority subject to the directors' review; if not, then he ought to have assumed the usual. See Fla.Stat.Ann. Sec. 607.111(4), (6) (West 1976). He was under no obligation to Watkins; rather he was employed by Six-L's. Thus his case is easily distinguishable from those of the nominal officer and corporate director in Quinn and Minotto, who were unsophisticated persons employed by the wrongdoers. Cf. Martino, 801 F.2d at 1414 (contrasting the enticement or coercion present in Quinn and Minotto with voluntary assumption of stock ownership or a responsible position in the violating company). Although there is language in those cases suggesting that liability under PACA should be premised on personal fault, they also indicate that realistic capacity to counteract the fault of others will also suffice. Quinn, 510 F.2d at 756 & n. 84; Minotto, 711 F.2d at 408.
 
 
 44
 Harris also argues that he resigned as a director at Watkins's request shortly after the sales agreement, in late March or early April 1983. The presiding officer rejected this argument, relying mainly on Harris's conduct and statements after he purported to resign. We find here that substantial evidence does not support the officer's conclusion.
 
 
 45
 Harris testified that he and Press tendered their resignations as directors to Watkins in late March 1983. Watkins responded by saying that he would get Harris and Press "off the books." J.A. B-216-17. Harris's testimony was uncontroverted. It was also corroborated by Wayne Press, who attended the same meeting and resigned at the same time. J.A. B-165. There is no specific credibility determination concerning Harris, but there is absolutely no indication that the presiding officer did not credit Harris's account of the meeting. Indeed, in the separate decision finding Press not to be responsibly connected, the presiding officer invoked Harris's testimony to support Press's account, suggesting that he found both Harris and Press to be credible witnesses. J.A. B-386.
 
 
 46
 Furthermore, the presiding officer's discussion of the need for formal removal, though expressing legally erroneous views, reflects his acceptance of Harris's testimony. He stated, "There is nothing in the record to show that Watkins fulfilled his commitment to buy the firm or have Petitioner removed as director." J.A. B-307. The officer's objection here is plainly not to the testimony. He regarded either the failure of Watkins to fulfill his commitment, or of Harris to resign in writing, as somehow rendering the resignation ineffective. But a director's resignation ordinarily need not be in writing. 2 C. Scotti, Fletcher Cyclopedia of the Law of Private Corporations Sec. 346 (1982). It certainly does not ordinarily require the approval of another director. See id. Sec. 347 (no acceptance of a director's resignation is necessary). Nothing in Veg-Mix's articles of incorporation or in the preincorporation agreement modified the usual rules.[8]
 
 
 47
 The presiding officer laid considerable weight on Harris's role in the efforts to protect Veg-Mix from Watkin's piracy. In October 1983 Paula Berry, Veg-Mix's bookkeeper and at the time its only employee, discovered that Watkins was drawing checks on its account for his personal purposes. She called Carlos Bustabad, the comptroller for Six L's, who in turn alerted Lipman. After discussing it with an attorney, Lipman told Bustabad and Fradin to try to stop the looting. They spoke to the bank, which agreed to cooperate, but only on the condition that Veg-Mix's directors sign a resolution. J.A. B-150-52. The Kuzzens officials sent resolution forms authorizing new check-signing procedures to Press and Harris for their signatures. Both signed such forms, despite their earlier resignations.
 
 
 48
 The presiding officer took this act (and the appearance of Harris's name on the bankruptcy petition) as showing that he had continued as a director. He quoted at length from a letter written by Harris to his attorney as follows:
 
 
 49
 After these facts had become evident, I was then made aware that my name may never have been formally removed as Director (i.e., writing) notwithstanding my oral resignation at the prior Director's meeting. It was at this point I sought legal counsel and he advised me that since Watkins had disappeared, there might be a moral obligation to preserve whatever assets could be located. He instructed me to see that this was done and I did just that.
 
 
 50
 Our method was to revoke any oral resignation since it was not in writing and Watkins was not present to verify that my resignation had been formally accepted. I was further advised to take steps to bring the corporation under the protection of the bankruptcy court by participating in the bankruptcy proceedings.
 
 
 51
 The presiding officer failed to make clear exactly what inference he drew from this letter, but counsel for the agency suggests that it shows that Harris questioned the validity of his own resignation. Brief for Respondent in 86-1201 and 86-1202 at 47. We agree that it shows uncertainty on Harris's part as to his status. But far from undermining his claims, the letter in the main supports them. Obviously, Harris's legal notions do not determine the legal effect of his oral resignation. Similarly, his supposition that he could revoke his resignation would not make it so. See Fla.Stat.Ann. Sec. 607.114(3), (6) (West 1976) (shareholders to elect directors except in certain limited cases); see also 2 C. Scotti, supra, at Sec. 285 (same). The evidence strongly indicates that he made an effective resignation. His letter is completely consistent with his testimony describing his resignation.
 
 
 52
 The letter is also consistent with the testimony of Press. Indeed, the participation of Press in the affairs of Veg-Mix was in most respects identical to that of Harris. Each acted to keep Watkins from wrongfully withdrawing funds, signing documents representing himself as a director for the bank; the names of both appeared on the bankruptcy petition. Although Harris knew about his directorship sooner than Press, their activity affecting Veg-Mix after the resignation was almost identical. It made no sense for the presiding officer to find that Harris's signing of banking resolutions showed that he was a director, while Press's signing did not prove the same for him.[9]
 
 
 53
 In sum, we find that substantial evidence supports the finding that Harris was initially a director of Veg-Mix, but not the finding that he continued to be a director (or responsibly connected person) after his resignation. At the time of the resignation, only a few of the transactions had taken place--the ones with Syracuse & Jenkins. Both because of their quantity and the newly offered evidence that they were open to legitimate dispute at the time, there is reason to doubt that they constitute repeated or flagrant transactions for purposes of Sec. 499h(a). If they do not, then Harris would face no penalties as a responsibly connected person. We therefore remand Harris's case to await the agency's decision in Veg-Mix.
 
 
 54
 So ordered.
 
 
 55
 MIKVA, Circuit Judge, dissenting in part and concurring in part:
 
 
 56
 I would affirm all three of these connected cases rather than remand the Veg-Mix and Harris decisions for further proceedings by the Secretary of Agriculture under the Perishable Agricultural Commodities Act ("PACA"). The record fully supports the Secretary's conclusion that Mr. Harris was "responsibly connected" with Veg-Mix during the entire period of its "flagrant" and "repeated" misconduct. In deciding that the Secretary's determination on this point is not supported by substantial evidence, this Court indulges in an excessively intrusive and picayune review of the fact-finder's decision and arrogates to itself the role assigned to the administrator. By remanding for an evaluation of whether transactions predating Harris' alleged resignation as a Veg-Mix director constitute a course of "flagrant or repeated" misconduct in violation of PACA, we invite the very full-scale hearing which the majority itself concedes was properly denied under PACA.
 
 
 57
 PACA accords sellers of perishable fruits and vegetables some very special protection against non-payment. Merchants in these commodities must be licensed, and the Act allows the Secretary of Agriculture to revoke the licenses of merchants whose offenses are "flagrant or repeated." Persons "responsibly connected" to merchants who so violate the Act can be barred from holding a license or working for a licensee for specified periods.
 
 
 58
 The majority agrees with the hearing officer's determination, which was affirmed by the agricultural marketing administrator and adopted by the Secretary, that the violations of PACA by Veg-Mix were "flagrant" and "repeated" in nature. The Secretary additionally affirmed the findings that appellants Kuzzens, Inc. and Harris were "responsibly connected" with Veg-Mix throughout the relevant period. On review, the majority acknowledges that Kuzzens was responsibly connected with Veg-Mix, but weaves a convoluted and tortuous doubt about whether Harris was appropriately found to be responsibly connected with Veg-Mix during the period in question. The record and the decision of the presiding officer make this doubt unreasonable.
 
 
 59
 Harris, a lawyer and family member of the dynastic financial sponsor of Veg-Mix and Kuzzens, Inc., drew the original articles of incorporation for Veg-Mix. Harris inserted himself as one of three directors (as well as the registered agent) of the corporation. The preincorporation agreement and the bylaws of Veg-Mix provided that the day-to-day affairs would be managed by the disappeared culprit, Watkins, subject to "periodic review" by the board of directors.
 
 
 60
 The disposition of this case turns on whether Harris continued as a director of Veg-Mix throughout its short and unhappy life. Harris claimed that he orally resigned as director in late March or April of 1983, after at least some of the delayed payment purchases were made by Veg-Mix. The presiding officer obviously found nothing in the record to conclusively confirm Harris' resignation and he noted that the particular actions Harris took subsequent to his alleged oral resignation contradicted his testimony. These actions included signing bank resolutions and bankruptcy petitions as a director. Accordingly, the Secretary specifically held that "[t]he record fully supports the conclusion that petitioner (Harris) was appointed a director of Veg-Mix, Inc. and he remained a director during the business span in question." I think it can be reasonably concluded, therefore, that he did not believe Harris' version of events.
 
 
 61
 The majority boldly pries into the fact-finder's reasoning process and faults him for not explicitly stating that Harris was not credible. From this omission it is inferred that the presiding officer believed Harris' story about the oral resignation as director, thereby undermining the fact-finder's own conclusion. The majority even suggests that the hearing officer must have found Harris a credible witness here, since he cited a corroborating statement by Harris in a related proceeding.
 
 
 62
 However, it is simply not our place to lay down a rule of "once credible, always credible" when certain witness statements were contradicted by a course of conduct, and greater weight was justifiably placed on the latter. The fact-finder need not make every step of his reasoning explicit in order to insulate his conclusions from this kind of high-handed judicial revisionism. I have never understood our reviewing process to include a course in opinion-writing for Article II officials. I have no doubt that such a course might be helpful, just as it might help those of us laboring as Article III officials. The test, however, is not whether the opinion is well-written but whether it meets the requirements of reasoned decision-making when reviewed under an "arbitrary and capricious" standard. While the reviewing court may not supply a reasoned basis for the agency's action that the agency itself has not given, SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The administrative adjudicator is only required "to state findings of fact and reasons to support its decision ... [that] must be sufficient to reflect a considered response to the evidence and contentions of the losing party." Harborlite Corp. v. I.C.C., 613 F.2d 1088, 1092 (1979). It certainly cannot be said here that the Secretary failed to "articulate any rational connection between the facts found and the choice made," Burlington Truck Lines v. U.S., 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962), or that the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1982).
 
 
 63
 It is hardly doubtful that the opinion of the Secretary can be matched with his duties under the Act. He found "repeated" and "flagrant" violations of PACA by Veg-Mix. There is ample evidence to sustain that finding. He found Harris to be "responsibly connected" with Veg-Mix during the entire period in question. There is ample evidence to sustain that finding. That ought to be the end of our review.
 
 
 64
 The Supreme Court has advised, admonished, and instructed us as reviewing courts not to try to assume the role that Congress ordained for administrators. When reviewing the record, as in SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942), or addressing agency choice of procedure, see Vermont Yankee Nuclear Power Corp. v. NRDC, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), or scrutinizing agency statutory interpretation, see Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1983), the Court has repeatedly exhorted us to remember the limited nature of our review. We neither teach nor supervise administrators in their administrative capacities. Our review must be cabined to those tasks which preserve the primacy of the administrators as the fact-finding, interpretive, and enforcement officials under the statutes creating their distinctive role.
 
 
 65
 The instant case represents a classic example of overreaching the modest review tasks assigned to us under statute. Had Congress wanted the courts to play a more active role in carrying out the statutory mission, it could have made these violations of PACA criminal offenses. Instead, Congress provided for civil sanctions and knowingly chose the machinery of administrative law. We ought to respect that choice and resist the temptation to teach the administrators how to write opinions, or how to order their reasoning.
 
 
 
 [1]
 Section 1.139 provides in part:
 The failure to file an answer, or the admission by the answer of all the material allegations of fact contained in the complaint, shall constitute a waiver of hearing.... Upon such admission or failure to file, complainant shall file a proposed decision, along with a motion for the adoption thereof....
 
 
 [2]
 There is no indication in the record before us that this request was ever ruled on. At oral argument counsel for Veg-Mix indicated that he did not press for a response because he was pessimistic about the chances for success
 
 
 [3]
 7 C.F.R. Sec. 1.145(i) (1987) provides in part:
 If the Judicial Officer decides that no change or modification of the [ALJ's] decision is warranted, the Judicial Officer may adopt the [ALJ's] decision as the final order in the proceeding, preserving any right of the party bringing the appeal to seek judicial review of such decision in the proper forum.
 We note with some surprise that agency counsel failed to direct our attention to this regulation.
 
 
 [4]
 Counsel for the agency has suggested in a footnote unaccompanied by record authority that "the seeds of injury were inevitably planted during ... Harris' tenure in office as a director." Brief for Respondents in Nos. 86-1201 and 86-1202 at 19 n. 10. We fail to see the inevitability; this statement is pure ipse dixit. It strikes us as unlikely, moreover, that the definition of responsibly connected could stretch far enough to include connection to an enterprise that will one day become a PACA violator
 
 
 [5]
 Petitioners also argue that there is some uncertainty as to Veg-Mix's corporate status under Florida law. That law requires a corporation to have the number of initial directors fixed by the articles of incorporation, Fla.Stat.Ann. Sec. 607.114(1) (West 1976), in this case three, J.A. B-343-44. Petitioners allege that Press never became a director, J.A. 368-69, and therefore that Veg-Mix never came into being as a corporation
 Before the presiding officer, petitioners made no such claim, but rather asserted in their Proposed Findings of Fact that "Veg-Mix was a Florida corporation...." J.A. B-406. They did raise the contention in their petition for administrative review, J.A. B-469, but the judicial officer did not address the matter, perhaps relying on 7 C.F.R. Sec. 1.141(g)(2)(ii) (1987) (requiring objection below). Jurisdictional objections aside, petitioners' argument avails Kuzzens nothing, for in default of corporate form Veg-Mix would be either a partnership (of which it would be a partner) or an association (of which it would be a shareholder within the meaning of 7 U.S.C. Sec. 499a(9)). Invocation of the defect by Harris encounters Florida's provision that no "persons acting as a corporation shall be permitted to set up the lack of legal organization as a defense to an action against them as a corporation." Fla.Stat.Ann. Sec. 607.401 (West 1976). While perhaps not directly in point, it suggests that one who acts as incorporator (as Harris did) could not, to escape any obligations arising out of the corporate form, invoke the corporation's failure to secure the acceptance of a directorship by a person named as a director in the articles of incorporation. See also id. Sec. 607.397 ("All persons who assume to act as a corporation without authority to do so shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof.").
 
 
 [6]
 Other circuits have read Sec. 499a(9) as establishing a per se rule of accountability for officers, directors, and major stockholders of PACA violators. Pupillo v. United States, 755 F.2d 638, 643-44 (8th Cir.1985); Birkenfield v. United States, 369 F.2d 491, 494 (3d Cir.1966). See also Steinberg & Son v. Butz, 491 F.2d 988, 992, 994 (2d Cir.), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 55 (1974); Zwick v. Freeman, 373 F.2d 110, 118-19 (2d Cir.) (noting that the sanctions desired by Congress according to Sec. 499h(b) "could be harsh in some cases," but finding the per se approach constitutionally valid), cert. denied, 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 (1967). The court in Pupillo, 755 F.2d at 644, explicitly criticized our analysis in Quinn and Minotto as "run[ning] afoul of Congressional intent."
 
 
 [7]
 See Minotto, 711 F.2d at 407 n. 3 (finding substantial evidence test applicable)
 
 
 [8]
 The government argues that the preincorporation agreement's requirement that "[a]ny and all notices between the parties hereto provided for or permitted under this Agreement or by law shall be in writing" binds Harris. Brief for Respondents in 86-1201 and 86-1202 at 47. The only parties to the agreement, however, were Watkins and Kuzzens. J.A. B-331
 
 
 [9]
 It is also worth noting that Bustabad and Fradin posed as Veg-Mix officers. This was apparently the agency's basis for issuing them preliminary notification of responsible connection liability. Bustabad's participation in Veg-Mix appears to have been more active than either Press or Harris--he organized the bank change and perhaps the bankruptcy petition--but he was determined not to be a responsibly connected person prior to the hearing. Fradin similarly participated in these affairs and was dropped from the proceedings