BELLSOUTH CORPORATION,
et al., Appellants,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee.

AT&T Corporation, et al., Intervenors.

No. 98–1019.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 25, 1998.

Decided Dec. 22, 1998.

Associate General Counsel, Laurence N. Bourne, Counsel, and Brian M. Hoffstadt, Special Counsel.

David W. Carpenter argued the cause for intervenors AT&T Corporation, et al. With him on the briefs were Peter D. Keisler, Mark C. Rosenblum, Roy E. Hoffinger, Donald B. Verrilli, Jr., Anthony C. Epstein, Ian Heath Gershengorn, William Single, IV, Sue D. Blumenfeld, David P. Murray, Charles C. Hunter, Catherine M. Hannan, Daniel L. Brenner, Neal M. Goldberg, David L. Nicoll, Richard J. Metzger, Emily M. Williams, Genevieve Morelli, Robert J. Aamoth, Richard S. Whitt, Riley M. Murphy, Danny E. Adams, Brad E. Mutschelknaus, John J. Heitmann, Jonathan E. Canis and James J. Freeman. Theodore. Whitehouse entered an appearance.

Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Philip D. Bartz, Acting Assistant Attorney General, Catherine G. O'Sullivan, Nancy C. Garrison, Robert B. Nicholson, Mark B. Stern, Jacob M. Lewis, and Alisa B. Klein, Attorneys, were on the briefs for intervenor United States of America.

William T. Lake, John H. Harwood, II and Robert B. McKenna were on the brief for intervenor U S WEST, Inc.

Kenneth S. Geller, Donald M. Falk, Harold S. Reeves, Theodore A. Livingston and John E. Muench were on the brief for intervenor Ameritech Corporation.

Before: EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

Separate statement filed by Circuit Judge SENTELLE, concurring in the result.

HARRY T. EDWARDS, Chief Judge:

This petition for review represents yet another attack by BellSouth Corporation on the constitutionality of the Telecommunications Act of 1996 (the "Act"). Just this past term, BellSouth challenged the validity of § 274 of the Act, 47 U.S.C. § 274 (Supp. II 1996), which limits the ability of Bell operating

Laurence H. Tribe argued the cause for appellants. With him on the briefs were Jonathan S. Massey, Michael K. Kellogg, Charles R. Morgan, William B. Barfield, M. Robert Sutherland, Jim O. Llewellyn and David G. Frolio. Walter H. Alford entered an appearance.

Christopher J. Wright, General Counsel, Federal Communications Commission, argued the cause for appellee. With him on the briefs were Daniel M. Armstrong, Associate General Counsel, John E. Ingle, Deputy

companies ("BOCs") to provide "electronic publishing." *See BellSouth Corp. v. FCC,* 144 F.3d 58 (D.C.Cir.1998) *("BellSouth I").* In this earlier case, BellSouth claimed that § 274 was an unconstitutional bill of attainder, because the subjects of its restrictions, the BOCs, are singled out by name. In the instant case, BellSouth Corporation, Bell-South Telecommunications, Inc., and Bell-South Long Distance, Inc. (collectively "Bell-South") challenge the validity of § 271 of the Act, 47 U.S.C. § 271 (Supp. II 1996), which prevents the BOCs from immediately providing in-region long distance telephone service absent satisfaction of certain statutory criteria.

Once again, BellSouth claims that the challenged provision, here § 271, is an unconstitutional bill of attainder and, in addition, that it results in a denial of equal protection and a violation of the separation of powers doctrine. BellSouth also seeks to overturn the Federal Communications Commission's ("FCC") denial of its application to provide long distance service in South Carolina, *see Application of BellSouth Corp., et al. Pursuant to Section 271 of the Communications Act of 1934, as amended, To Provide In–Region, InterLATA Services In South Carolina,* 13 F.C.C.R. 539 (1997) *("Order"),* contesting both the FCC's finding that BellSouth is foreclosed from petitioning to provide service under § 271(c)(1)(B), and the FCC's findings regarding BellSouth's compliance with certain "competitive checklist" items under § 271. We found no merit in the claims raised in *BellSouth I* and this challenge fares no better.

We hold that § 271 does not violate any of the constitutional provisions raised by Bell-South. The section does not violate the bill of attainder clause, because it does not inflict "punishment" on BellSouth. Instead, it is a rational and nonpunitive congressional enactment that serves to open telecommunications markets. Section 271 also does not violate the equal protection clause, because Congress had a rational basis for singling out the BOCs, *i.e.,* the unique nature of their control over their local exchange areas. Finally, § 271 does not violate the separation of powers doctrine, because Congress did not substitute its judgment for that of a court; rather it simply altered the prospective effects of a consent decree, which it was surely free to do.

We also find that the FCC was correct in concluding that BellSouth is foreclosed from petitioning to provide service under § 271(c)(1)(B), because BellSouth has failed to demonstrate that no "qualifying requests" for access. and interconnection have been made. Moreover, given our finding that BellSouth is foreclosed from providing service under § 271(c)(1)(B), we can find no reason to address the competitive checklist issues.

## I. BACKGROUND

As we noted in *BellSouth I,* the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996), "changed the entire telecommunications landscape." 144 F.3d at 61. Therefore, in order to put the instant case in proper focus, we begin with an overview of the industry landscape prior to the passage of the Act, as well as the Act itself.

### A. The Telecommunications Market and the 1996 Act

In 1982, the American Telephone & Telegraph Company ("AT&T") executed a consent decree, settling an antitrust suit brought by the Government in 1974. That decree, as modified by the District Court, is known as the Modification of Final Judgment ("MFJ"). *United States v. American Tel. and Tel. Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The principal element of the MFJ was the requirement that AT&T divest itself of its local exchange monopolies. BellSouth's two local operating companies, Southern Bell Telephone and Telegraph Company and South Central Bell Telephone Company, were among the twenty-two BOCs spun off as a result of the decree. Each of the twenty-two BOCs were grouped into seven unaffiliated regional Bell operating companies ("RBOCs"). Due to mergers, there are now only five RBOCs, one of which is BellSouth.

The MFJ prohibited the BOCs from certain lines of business, *including the provi-*

*sion of long distance services* across different "Local Access and Transit Areas" ("interLATA services"), because of the BOCs' "bottleneck" power over the local exchange facilities. *See* 552 F.Supp. at 223–24. (For the remainder of this opinion, we will refer to interLATA services as long distance services.) The MFJ also provided that the BOCs could petition for relief from these prohibitions, including the prohibition against providing long distance services, if the petitioning BOC could show "that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter." *Id.* at 231.

Over the life of the MFJ, the District Court granted nearly 300 waivers easing the restrictions of the decree. A few of these waivers were related to the long distance service restriction, but they were limited to the provision of services such as paging, time-of-day information, toll-free services, 911 services, international services, and cellular services. However, no BOC ever successfully petitioned under the MFJ to provide long distance telephone services.

In 1996, Congress passed the Act, by which it sought to open all telecommunications markets, including local telephone markets. To this end, many provisions of the Act were made generally applicable to incumbent local exchange carriers. For example, §§ 251 and 252 require all incumbents to permit new carriers to compete for local customers and set forth procedures that incumbents must follow in order to open their local markets to competition. *See* 47 U.S.C. §§ 251–252 (Supp. II 1996).

A critical feature of the Act is found in § 601(a)(1). This provision eliminated the prospective effects of the MFJ by providing that "[a]ny conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the [MFJ] shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and shall not be subject to the restrictions and the obligations imposed by [the MFJ]." Telecommunications Act of 1996 § 601(a)(1), 110 Stat. at 143.

In addition to the Act's generally applicable provisions and the elimination of the future effects of the MFJ, Congress enacted §§ 271 through 276, special provisions applicable only to the BOCs listed in § 153(4) of the Act. BellSouth is governed by these provisions. As noted in *BellSouth I,* "[i]n general these provisions simply maintained, and in most cases loosened, various restrictions to which the BOCs were already subject under the MFJ." 144 F.3d at 61. In other words, generally speaking, the BOCs were better off in terms of business market opportunities under the Act than they had been under the MFJ.

Section 271, the section at issue in this case, provides that the BOCs may immediately begin providing some categories of long distance services that were previously restricted under the MFJ. These services include "out-of-region" long distance services, *i.e.,* long distance services originating outside the state(s) in which a BOC is authorized to provide local telephone service, and "incidental" long distance services, such as audio and video programming and commercial mobile services. *See* 47 U.S.C. § 271(b)(2), (g). Section 271 prevents a BOC from immediately providing in-region long distance services. But this restriction may be overcome by fulfilling the requirements of § 271(c) and (d).

In order to provide in-region long distance services, a BOC must first demonstrate that either § 271(c)(1)(A), known as Track A, or § 271(c)(1)(B), known as Track B, has been satisfied. Track A requires a BOC to show that it has entered into an agreement to provide access and interconnection to "one or more unaffiliated competing providers of telephone exchange service . . . to residential and business subscribers." *Id.* § 271(c)(1)(A). Track B, on the other hand, requires a BOC to show that "no such provider has requested the access and interconnection described in subparagraph (A)" three months prior to the BOC's application. *Id.* § 271(c)(1)(B). Such a request is called a "qualifying request." *See Order* ¶ 59. In addition, even if a BOC has received a qualifying request, it may still proceed under Track B if the party that made the request

either failed to negotiate in good faith or failed to comply with an implementation schedule in an interconnection agreement. *See* 47 U.S.C. § 271(c)(1)(B); *SBC Communications Inc. v. FCC*, 138 F.3d 410, 413–14 (D.C.Cir.1998) (*"SBC Communications"*) (providing further explanation of Track A and Track B requirements).

If a BOC satisfies either Track A or B, it must then show that it offers the items listed in § 271(c)(2)(B), the "competitive checklist." *See* 47 U.S.C. § 271(d)(3)(A). Included on the competitive checklist are things such as nondiscriminatory access to 911 and E911 services, adequate operational support systems, nondiscriminatory access to unbundled network elements, and contract service arrangements at a wholesale discount. *See id.* § 271(c)(2)(B). A BOC must also be willing to provide its in-region long distance service through a separate subsidiary as required by § 272, and must persuade the FCC that its provision of long distance service "is consistent with public interest, convenience, and necessity." *See id.* § 271(d)(3)(B), (C).

### B. Procedural History

BellSouth filed an application on September 30, 1997 to provide in-region long distance services in South Carolina. *See Order* ¶ 1. It claimed that it had met the requirements of Track B as interpreted by the FCC in *Application of SBC Communications Inc., Pursuant to Section 271 of the Communications Act of 1934, as amended, To Provide In–Region, InterLATA Services In Oklahoma*, 12 F.C.C.R. 8685 (1997) (*"Oklahoma Order"*), aff'd, *SBC Communications v. FCC*, 138 F.3d 410 (D.C.Cir.1998). *See Order* ¶ 52. It also contended that it had generally offered all fourteen checklist items. *See* Brief in Support of Application by BellSouth for Provision of In–Region, InterLATA Services in South Carolina at 17–57, *reprinted in* Joint Appendix 317–57.

The FCC denied BellSouth's application, because it found that qualifying requests had been made for the services in South Carolina. *See Order* ¶ 67. Accordingly, BellSouth was not eligible to proceed under Track B. *See id.* It also found that BellSouth did not generally offer all fourteen checklist items.

*See id.* ¶ 240. BellSouth timely petitioned for review of the FCC's decision in this court on January 13, 1998.

### C. Other Relevant Developments

Since BellSouth filed its appeal, three cases relevant to this appeal have been decided. On March 20, 1998, this court decided *SBC Communications*, denying SBC's petition to review the so-called *Oklahoma Order*. In that case, SBC sought review of the FCC's denial of its request to provide in-region long distance services in Oklahoma. SBC argued that it had satisfied Track A, because another entity was providing service to 20 customers in the region. SBC argued in the alternative that it had satisfied Track B. The FCC denied SBC's request, because it found that SBC had not satisfied either Track A or Track B.

This court denied SBC's petition to review the FCC's decision, because it found that the other entity providing service in-region was doing so free of charge, and it was reasonable for the FCC to interpret "competing provider" in Track A to require an "actual commercial alternative to the BOC." *SBC Communications*, 138 F.3d at 416 (internal quotation marks omitted). This court also found that SBC had not satisfied Track B. Particularly relevant to this case, this court approved the FCC's interpretation that "Track B was foreclosed the moment a provider requested interconnection so long as [the FCC] could predict that the carrier would, after implementing the agreement, provide competitive service to both residential and business customers, at least predominantly over its own facilities." *Id.* at 417. Because SBC had received qualifying requests that satisfied the FCC's interpretation of Track B, it could not seek to provide long distance services under that track.

On May 15, 1998, this court decided *BellSouth I*, holding that § 274, which limited the ability of the BOCs to provide electronic publishing, was not a bill of attainder, nor did it violate the BOCs' right to free speech under the First Amendment. Although *BellSouth I* addressed many of the bill of attainder issues raised in this case, there are dif-

ferences between § 274 and § 271 that make this case somewhat different from that one.

On September 4, 1998, the Fifth Circuit decided *SBC Communications, Inc. v. FCC,* 154 F.3d 226 (5th Cir.1998) ("*SBC Communications (5th)*"), in which SBC had argued that all of the Special Provisions of the Act, 47 U.S.C. §§ 271–276, were unconstitutional. Reversing the district court, the Fifth Circuit found that the provisions did not constitute a bill of attainder, did not violate the separation of powers requirement, and did not violate the equal protection clause. It also found that the electronic publishing restrictions did not violate the BOCs' right to free speech under the First Amendment.

In the light of these developments, we now review the FCC's denial of BellSouth's application to provide long distance services in South Carolina.

## II.  ANALYSIS

This appeal presents five issues, three of which concern the constitutionality of § 271, and two of which concern the FCC's administration of the 1996 Act. We begin with BellSouth's bill of attainder challenge.

### A.  Bill of Attainder

■ Article I, section 9, clause 3 of the Constitution provides that "[n]o Bill of Attainder or ex post facto Law shall be passed." Although the prohibition against bills of attainder was one of the original guarantees of civil liberty, and has existed for over two hundred years, the Supreme Court has relied on it only five times to strike down legislation. *See United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); *United States v. Lovett,* 328 U.S. 303, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); *Pierce v. Carskadon,* 83 U.S. (16 Wall.) 234, 21 L.Ed. 276 (1872); *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866); *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866). Despite the infrequency with which this clause arises in litigation, however, its meaning has nevertheless continued to evolve.

In our most recent bill of attainder case, *BellSouth I,* we addressed issues similar to those raised in this case. However, that decision dealt with § 274 of the Act, and the differences between § 274 and § 271 distinguish *BellSouth I* from the instant case.

First, § 274 sunsets on February 8, 2000. *See* 47 U.S.C. § 274(g)(2). Section 271 has no such sunset date. In addition, § 274 allows the BOCs to provide electronic publishing if they do so through a separate affiliate. Section 271 allows the BOCs to provide in-region long distance services through a separate affiliate, but only after they have received the approval of the FCC by satisfying the requirements of § 271(c) and (d). Finally, § 274 added restrictions on the BOCs that had been lifted from the MFJ in 1991. Section 271, however, is merely a revised version of the MFJ restrictions covering the provision of long distance services that were still in effect when the Act was passed.

■ As we explained in *BellSouth I,* when the Constitution was drafted, "bills of attainder" were acts that sentenced named persons to death without the benefit of a trial. *See BellSouth I,* 144 F.3d at 62. By the end of the nineteenth century, however, the Supreme Court had included penalties short of death among those prohibited by the bill of attainder clause. *See id.* Today, the prohibition against bills of attainder prevents any "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett,* 328 U.S. 303, 315, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). Thus, under the most current interpretations of the bill of attainder clause, a law is prohibited if it (1) applies with specificity, and (2) imposes punishment.

As we made clear in *BellSouth I, see* 144 F.3d at 62–63, both of these elements must be present before we will find an unconstitutional bill of attainder. Indeed, the Supreme Court has *required* both specificity *and* punishment before it will find that a law constitutes a bill of attainder. In its most recent bill of attainder cases, *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 851, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), and *Nixon v. Adminis-*

*trator of General Services,* 433 U.S. 425, 469–72, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court has clearly stated that satisfaction of the specificity prong alone is *not* sufficient to find that a particular law implicates the bill of attainder clause, let alone violates it. *See Selective Service,* 468 U.S. at 851, 104 S.Ct. 3348 ("Even if the specificity element were deemed satisfied by [the statutory provision in question], the statute would not necessarily implicate the Bill of Attainder Clause. The proscription against bills of attainder reaches only statutes that inflict *punishment* on the specified individual or group.") (emphasis added); *Nixon,* 433 U.S. at 471–72, 97 S.Ct. 2777 ("[T]he Act's specificity—the fact that it refers to appellant by name—does not automatically offend the Bill of Attainder Clause.").

The Court's jurisprudence on this point is hardly surprising, because

[l]egislative measures often grant or withhold benefits or burdens from precisely identified individuals or groups. A bailout for Chrysler might be seen as a burden to Ford, a subsidy to Lockheed as a competitive blow to Boeing, a private bill for a favored constituent as a severe disappointment to a neighbor, a tax break for one company as a punishment for a competitor. Yet the bill of attainder ban has, quite properly, never been regarded as an obstacle to all such measures—a guarantee that all lawmaking activity will proceed through majestic generalities. Although the Supreme Court once struck down a statute exempting American Express by name from a generally applicable economic regulation, that decision was itself overruled two decades later, when the Court upheld a law permitting two identified vendors to continue hawking their wares in New Orleans' French Quarter but forbidding all of their competitors to do so.

It is only laws that inflict *punishment* on legislatively specified individuals that the bill of attainder ban condemns, and the examples noted above make plain that not all burdens may be deemed punishments for this purpose even when legislative "specification" is shown.

LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 10–5, 650–51 (2d ed.1988) (footnotes omitted).

In addition, we also note that, as in *BellSouth I,* both parties have assumed "that the Bill of Attainder Clause protects corporations as well as individuals." *BellSouth I,* 144 F.3d at 63. Although we make the same assumption here, it is obvious that there are differences between a corporation and an individual under the law. Thus, any analogy between prior cases that have involved individuals and this case, which involves a corporation, must necessarily take into account this difference.

Turning to the first step in the bill of attainder analysis, there is no doubt that § 271 singles out the BOCs by name. *See* 47 U.S.C. §§ 153(4)(A), 271(a). Thus, because the section applies with specificity, the first prong of the bill of attainder query is satisfied.

■ The next question, then, is whether § 271 inflicts "punishment" on the BOCs. To answer this question, we must look, as we did in *BellSouth I, see* 144 F.3d at 64, to the "three necessary inquiries" articulated in *Selective Service,* which in turn are based on the Court's analysis in *Nixon:*

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Selective Service,* 468 U.S. at 852, 104 S.Ct. 3348 (quoting *Nixon,* 433 U.S. at 473, 475–76, 478, 97 S.Ct. 2777). As we noted in *BellSouth I,* the second factor invariably appears to be "the most important of the three." 144 F.3d at 65. However, in this case, we assign no particular weight to any of the three factors, because we find that none of the three inquiries result in a finding that the challenged legislation constitutes punishment.

1.  The Historical Meaning of Legislative Punishment

Our first inquiry under *Selective Service* and *Nixon* is whether § 271 falls within the historical meaning of legislative punishment. In the earliest cases construing the provision, the only punishment prohibited by the bill of attainder clause was a sentence of death. *See Nixon,* 433 U.S. at 473, 97 S.Ct. 2777. However, the Court long ago extended the protections of the clause to include "bills of pains and penalties." *Id.* at 474, 97 S.Ct. 2777. Bills of pains and penalties "historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by a sovereign." *Id.* (footnotes omitted). In the Court's most recent jurisprudence, the definition of punishment "has expanded to include legislative bars to participation by individuals or groups in specific employments or professions." *Selective Service,* 468 U.S. at 852, 104 S.Ct. 3348. For example, the Court has held that barring an individual from holding office in a labor union falls within the list of historical punishments forbidden by this clause. *See United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). BellSouth argues that § 271 falls under this last category, because it imposes unique restrictions on the BOCs' ability to provide long distance services in-region.

BellSouth made this same argument with respect to § 274 in *BellSouth I. See* 144 F.3d at 64–65. In that case, although § 274 permitted the BOCs to enter into the electronic publishing market through structurally separated affiliates, we assumed, *arguendo,* that the BOCs were not permitted to participate in that market at all. We then rejected the challenge to the statute, in part, on the ground that "the Supreme Court in *Brown* strongly suggested that line-of business restrictions pose no bill of attainder concerns." 144 F.3d at 65. Likewise, we see no concerns in this case.

Even leaving aside our analysis in *BellSouth I,* the Supreme Court has said that "[a] statute that leaves open perpetually the possibility of [overcoming a legislative restriction] does not fall within the historical meaning of forbidden legislative punishment." *Selective Service,* 468 U.S. at 853, 104 S.Ct. 3348. BellSouth attempts to nullify this point by citing the Court's earlier opinion in *Brown* saying that "inescapability" is not "an absolute prerequisite to a finding of attainder." 381 U.S. at 457 n. 32, 85 S.Ct. 1707. The *Brown* decision cited, as an example, the famous post-Civil War case, *ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866), which involved a challenge to a statute requiring attorneys to swear that they had not participated in the rebellion against the Union before they could practice in federal court. *See Brown,* 381 U.S. at 447, 85 S.Ct. 1707. The Court in *Garland* struck down the provision as a bill of attainder, because it was found to be a "legislative act[ ] inflicting punishment on a specific group: ... lawyers who had taken part in the rebellion and therefore could not truthfully take the oath." *Id.*

This case is a far cry from *Garland* and other such cases, however. Section 271 only requires that, in order to prevent the creation of monopolies, the BOCs must open their local telephone markets to competition. Thus, much like the statute in *Selective Service,* which simply required individuals to register for the draft before they would be eligible for financial aid, § 271 leaves open the very real possibility that the BOCs may qualify to provide long distance services in-region by simply meeting the requirements of that section. *Cf. Selective Service,* 468 U.S. at 853, 104 S.Ct. 3348. Viewed in this light, § 271's requirements are no different than numerous regulatory measures aimed at particular industries that have never been held to inflict punishment.

For example, it would be patently absurd, we think, for an inorganic chemical manufacturing company to argue that because it must comply with environmental laws specific to that industry, Congress has "punished" it in violation of the bill of attainder clause. Leaving aside the nonpunitive purpose of such laws, it is clear that the environmental laws perpetually leave open the possibility that the company may still manufacture lawful products by simply employing the appropriate pollution control techniques or devices.

Moreover, the cases in which employment bars have been struck down are those in which the ban was used as "a mode of punishment ... against those legislatively branded as disloyal." *Nixon*, 433 U.S. at 474, 97 S.Ct. 2777; *see United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (striking down statute that imposed sanctions on one who was a member of the Communist Party and an officer or employee of a labor union); *United States v. Lovett*, 328 U.S. 303, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (striking down statute that cut off the salary of three named employees based on their membership in the Communist Party); *ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866) (striking down statute that required attorneys to take oath that they had not aided the Confederacy before being allowed to practice in federal court); *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866) (striking down amendments to state constitution that barred people from teaching as well as other professions because they had aided or sympathized with the Confederacy). When the Court extended "punishment" to include employment bars, it did so because it was concerned that the government had imposed restrictions that violated the fundamental guarantees of political and religious freedom. Here, there is no indication that run-of-the-mill business regulations, such as § 271, implicate these same concerns. Thus, it is difficult to see how § 271 can be equated with the employment bar cases relied upon by BellSouth.

Furthermore, we note that the Supreme Court has approved other line-of-business restrictions without ever suggesting that the restrictions constituted "punishment." *See, e.g., FCC v. National Citizens Committee for Broad.*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) (upholding FCC rules banning broadcast licensee from owning newspaper in same market); *Board of Governors of Fed. Reserve Sys. v. Agnew*, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408 (1947) (upholding conflict-of-interest statute that prevented employees of securities underwriting firms from simultaneously working for banks that belong to Federal Reserve System). Thus, we find that § 271 does not fall within the list of historical punishments recognized by the Court.

### 2. Furthering Nonpunitive Purposes

As we noted in *BellSouth I*, even if a statute does not fall within the historical definition of punishment, our inquiry under the bill of attainder clause does not end. Instead, we must ensure that a nonpunitive legislative purpose is served by the legislation in order to prevent "Congress from circumventing the clause by cooking up newfangled ways to punish disfavored individuals or groups." *BellSouth I*, 144 F.3d at 65. Thus, we must now determine whether § 271 furthers nonpunitive legislative purposes. *See BellSouth I*, 144 F.3d at 65; *Siegel v. Lyng*, 851 F.2d 412, 418 (D.C.Cir.1988).

Before we begin our analysis of § 271 under this prong, we note that we must proceed carefully when characterizing a statute as one that "reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475–76, 97 S.Ct. 2777. We recognize, for example, that a statute that names an individual and sentences him to death is a bill of attainder, without regard to whether Congress could articulate some nonpunitive purpose for the execution, such as the protection of public safety. *See Brown*, 381 U.S. at 458, 85 S.Ct. 1707. In other words, we must ensure that " 'the nonpunitive aims of an apparently prophylactic measure [are] sufficiently clear and convincing,' " *BellSouth I*, 144 F.3d at 65 (quoting TRIBE, *supra*, § 10–5, at 655), before we find that it does not constitute a bill of attainder.

The Supreme Court has consistently looked to nonpunitive purposes when assessing whether a statute inflicts punishment. As early as 1889, the Court recognized that, even though employment bars were considered punitive in *Cummings* and *Garland*, a law that imposed certain requirements on individuals before they could practice medicine did not constitute a bill of attainder. *See Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889). In distinguishing the earlier cases of *Cummings* and *Garland*, the Court stated:

There is nothing in these decisions which supports the positions for which the plaintiff in error contends. They only determine, that one who is in the enjoyment of a right to preach and teach the Christian religion as a priest of a regular church, and one who has been admitted to practise the profession of the law, cannot be deprived of the right to continue in the exercise of their respective professions by the exaction from them of an oath as to their past conduct, respecting matters which have no connection with such professions. Between this doctrine and that for which the plaintiff in error contends there is no analogy or resemblance. The constitution of Missouri and the act of Congress in question in those cases were designed to deprive parties of their right to continue in their professions for past acts, or past expressions of desires and sympathies, many of which had no bearing upon their fitness to continue in their professions. The law of West Virginia was intended to secure such skill and learning in the profession of medicine that the community might trust with confidence those receiving a license under authority of the State.

*Dent,* 129 U.S. at 128, 9 S.Ct. 231.

The Court later found in *Hawker v. New York,* 170 U.S. 189, 197, 18 S.Ct. 573, 42 L.Ed. 1002 (1898), that a law prohibiting convicted felons from practicing medicine did not inflict punishment and therefore was not a bill of attainder. In so finding, the Court stated that "[t]he State is not seeking to further punish a criminal, but only to protect its citizens from physicians of bad character." *Id.* at 196, 18 S.Ct. 573. The Court also noted that, although there may be alternate ways of determining good character, it was up to the legislature to make this decision:

> It is no answer to say that this test of character is not in all cases absolutely certain, and that sometimes it works harshly. Doubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. But the legislature has power in cases of this kind to make a rule of universal application, and no inquiry is permissible back of the rule to ascertain

whether the fact of which the rule is made the absolute test does or does not exist. *Id.* at 197, 18 S.Ct. 573.

The Court again embraced the point that burdensome regulation cannot simply be equated with punishment in *De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960). In that case, the Court held that a statute prohibiting convicted felons from being officers of a waterfront union did not violate the bill of attainder clause:

> Clearly, § 8 embodies no further implications of appellant's guilt than are contained in his 1920 judicial conviction; and so it manifestly is not a bill of attainder.... The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession. No doubt is justified regarding the legislative purpose of § 8. The proof is overwhelming that New York sought not to punish ex-felons, but to devise what was felt to be a much-needed scheme of regulation of the waterfront, and for the effectuation of that scheme it became important whether individuals had previously been convicted of a felony.

*Id.* (citation omitted).

This court, too, has had occasion to determine whether certain legislation constituted forbidden punishment or legitimate, nonpunitive regulation. In *Siegel v. Lyng,* Siegel had been the President, Director, and majority shareholder of a company that was cited for flagrant and repeated violations of the Perishable Agricultural Commodities Act ("PACA"). *See* 851 F.2d at 413. Under that Act, someone who was formerly "responsibly connected" with a violator of the Act was barred from employment with any other licensee under the Act for one year. *See id.* at 414–15. The court found that this prohibition did not inflict "punishment" under the bill of attainder clause, *see id.* at 417, because there were legitimate justifications for the employment bar:

This Court recently echoed Congress' express purpose behind the PACA enforcement regime, including the employment restrictions: namely, that the Act's "special sanctions against dishonest or unreliable dealing" "help instill confidence in parties dealing with each other on short notice, across state lines and at long distances...." [*Veg-Mix, Inc. v. United States Dep't of Agric.*, 832 F.2d 601, 604 (D.C.Cir.1987)]. This legislative and executive resolve to guarantee that PACA transactions by firms employing persons "responsibly connected" to disciplined licensees be conducted with easy-to-monitor, scrupulous compliance with the Act is ample justification for the temporary employment bar.

*Id.* at 418 (footnote omitted); *see also Zwick v. Freeman*, 373 F.2d 110, 119–20 (2d Cir. 1967) (finding that the same PACA employment bar was not a bill of attainder).

Likewise, in *Dehainaut v. Pena*, 32 F.3d 1066, 1071–72 (7th Cir.1994), the Seventh Circuit was asked to determine the constitutionality of an Office of Personnel Management policy that indefinitely barred former air traffic controllers who had participated in a strike against the federal government from reemployment with the Federal Aviation Administration ("FAA"). The court found that the policy did not constitute a bill of attainder and, in so finding, the court specifically stated that:

> Even where a fixed identifiable group—such as the fired controllers—is singled out and a burden traditionally associated with punishment—such as permanent exclusion from an occupation—is imposed, the enactment may pass scrutiny under bill of attainder analysis if it seeks to achieve legitimate and non-punitive ends and was not clearly the product of punitive intent. Put differently, "[t]he question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession."
>
> ....
>
> ... Here, by contrast, we find an adequate nexus between the restriction imposed and the legitimate governmental purpose. President Reagan determined that the intermingling of controllers who had been fired for striking with those who had replaced them would interfere with the safety and efficiency of the FAA's operations.

*Id.* (citations omitted); *see also* 2 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 15.9(c), at 476–77 (2d ed.1992) ("[W]henever the Court is confronted with the claim that legislation constitutes a bill of attainder, it must determine whether the designation of persons based on past conduct simply names individuals for punishment or whether the designation promotes a *nonpunitive* goal based on reasonable criteria over which the individual has some control."); TRIBE, *supra*, § 10–5, at 655 ("Even measures historically associated with punishment—such as permanent exclusion from an occupation—have been otherwise regarded when the nonpunitive aims of an apparently prophylactic measure have seemed sufficiently clear and convincing.").

Thus, even if the restrictions of § 271 were equivalent to an employment bar—an assumption that we do not endorse—the section would not offend the bill of attainder clause if it furthers nonpunitive purposes. The question, then, is whether there is convincing evidence of legitimate, nonpunitive purposes furthered by § 271 that prevent us from striking it down. We believe there is.

First, § 271 was passed as part of the 1996 Act, an act that Congress hoped "would 'provide for a pro-competitive, deregulatory national policy framework ... by opening all telecommunications markets to competition.'" *SBC Communications*, 138 F.3d at 413 (quoting H.R. CONF. REP. No. 104–458, at 1 (1996)). As we explained in *SBC Communications*, changing the entire telecommunications landscape was a monumental and difficult task for Congress. Deregulating the long distance services market was particularly difficult:

The question of how best to achieve that goal ... was the subject of great debate. Some thought that the local and long-distance markets should be open to all competitors immediately. Others believed that the BOCs should have to wait until actual competition was introduced in their local markets before providing interLATA service, since it was claimed that the long-distance market is already competitive. As might be expected for an issue of this economic significance, an extended lobbying struggle ensued. The end product was a compromise between the competing factions. .

States and localities were no longer to sanction local monopolies; they are now barred from "prohibiting the ability of any entity to provide ... intrastate telecommunications service." 47 U.S.C.A. § 253(a) (West Supp.1997). The BOCs are obliged to provide any requesting carrier with non-discriminatory interconnection to their networks and nondiscriminatory access to un-bundled network elements at reasonable rates, terms, and conditions; they must also offer telecommunications services at wholesale rates for resale to end users. 47 U.S.C.A. § 251(c).

*Id.*

Second, it is clear that requiring the BOCs to comply with § 271 is not punitive, but, rather, legitimately based on the infrastructure they control. As the legislative history notes,

> The seven BOCs provide over 80% of local telephone service in the United States. Several hundred other carriers provide the balance of local service. While some competition has developed in the local business service and exchange access markets, local residential service remains a monopoly service.

H.R.REP. No. 104–204, pt.1, at 49 (1995). And, as we found in *BellSouth I,* "[b]ecause the BOCs' facilities are generally less dispersed than [those of other competitors], they can exercise bottleneck control over both ends of a telephone call in a higher fraction of cases than can [other competitors]." 144 F.3d at 67.

Furthermore, prior to the passage of the Act, the BOCs were subject to the MFJ because of their peculiar characteristics and assets, and it was perfectly proper for the legislature to look at the MFJ's findings as evidence of the BOCs' dominance in the market. Thus, it was proper for the legislature to consider the prior judicial findings embodied in the MFJ, not because Congress seeks to punish the BOCs based on that decree, but, rather, because it hopes "to devise what [i]s felt to be a much-needed scheme of regulation" in the long distance services market. *See De Veau,* 363 U.S. at 160, 80 S.Ct. 1146. And, "for the effectuation of that scheme," *see id.,* it was important to treat the BOCs differently, because, as the District Court found in approving the MFJ, preventing the BOCs from providing long distance services was "clearly necessary to preserve free competition in the interexchange market." 552 F.Supp. at 188.

In addition, as we noted in *BellSouth I,* Congress may read the evidence before it in a different way than might this court or any other, so long as it remains clear that Congress was pursuing a legitimate nonpunitive purpose. *See* 144 F.3d at 66. In other words, it does not matter that Congress arguably could have enacted different legislation in an effort to open the long distance markets to competition. The main point here is that it cannot be legitimately "suggested that the risks of anticompetitive conduct were so feeble that no one could reasonably assert them except as a smoke screen for some invidious purpose (much less for the specific invidious purpose of 'punishing' the BOCs)." *Id.* And just as the Court in *Hawker* acknowledged that ex-felon status was "not in all cases [an] absolutely certain" test of character, "and that sometimes it works harshly," 170 U.S. at 197, 18 S.Ct. 573, such a determination does not render legislation unconstitutional under the bill of attainder clause.

In sum, we find that § 271 furthers legitimate, nonpunitive purposes: Congress required the BOCs to open their local markets to competition before allowing them to enter the long distance services market in-region, because, due to the unique infrastructure

controlled by the BOCs, they could exercise monopoly power. Moreover, there is adequate support for this reasoning, particularly in light of the MFJ. Thus, as we noted in *BellSouth I,* "the differential treatment of the BOCs and non-BOCs, is neither suggestive of punitive purpose nor particularly suspicious." 144 F.3d at 67. Accordingly, we find that § 271 furthers nonpunitive purposes.

### 3. Legislative Intent To Punish

█ Finally, we briefly address the final prong of the punishment test: whether the legislative record indicates a legislative intent to punish. As we noted in *BellSouth I,* BellSouth must show "'unmistakable evidence of punitive intent.'" 144 F.3d at 67 (quoting *Selective Service,* 468 U.S. at 856 n. 15, 104 S.Ct. 3348). "[S]everal isolated statements" are not sufficient to evince punitive intent. *See Selective Service,* 468 U.S. at 856 n. 15, 104 S.Ct. 3348.

BellSouth again cites here, as it did in *BellSouth I,* the remarks of members of Congress that refer to the history of the BOCs and the breakup of AT&T. *See* Brief for Appellants at 28–29; Reply Brief for Appellants at 13–14 n.7. But, as we said in *BellSouth I,* the "few scattered remarks referring to anticompetitive abuses allegedly committed by the BOCs in the past" do not provide the kind of "'smoking gun' evidence of congressional vindictiveness." 144 F.3d at 67. Furthermore, as we explained above, Congress was justified in considering the MFJ when drafting the 1996 Act. Thus, we find that BellSouth has failed to show the "unmistakable evidence of punitive intent" that is required under *Selective Service.*

In sum, we find that § 271's restrictions do not fall within the historical meaning of legislative punishment, that they further nonpunitive purposes, and that there is no unmistakable evidence of legislative intent to punish. Thus, we find that § 271 does not constitute punishment according to the test articulated in *Selective Service.*

### 4. The Beneficial Effects of § 271

The result that we are constrained to reach in this case makes sense in light of the history of the BOCs in the telecommunications industry. As the FCC points out, § 271 actually "*benefits* the BOCs by relieving them of certain burdens." Brief for Appellee at 19; *see* Brief of Intervenors in Support of the FCC at 17 ("Section 271 cannot qualify as punishment unless it deprives BOCs of a right 'previously enjoyed.'") (quoting *United States v. Brown,* 381 U.S. 437, 448, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965)). Indeed, in *BellSouth I,* we commented that "BellSouth's claim of punitive purpose is somewhat undermined by § 274's placement in an Act that as a whole *relieves* the BOCs of several of the burdens imposed by the MFJ, particularly by prescribing in § 271 a method whereby the BOCs can achieve a long-sought-after presence in the long distance market." 144 F.3d at 66.

BellSouth, however, argues that we should not compare the status of the BOCs under the MFJ in determining whether § 271 imposes punishment. Instead, BellSouth contends that "whether section 271 punishes the BOCs must be tested by comparing how it treats the BOCs as compared to other [local exchange carriers]—not by comparing the MFJ to the 1996 Act." Brief for Appellants at 20–21. In response, the FCC and the intervenors are quick to point out that counsel for BellSouth readily embraced a comparison between the restrictions of the 1996 Act and the MFJ when he testified before Congress:

[I]nsofar as MFJ restrictions are left in place pursuant to the decision of the D.C. Circuit [in *United States v. Western Electric Co.,* 900 F.2d 283 (D.C.Cir.1990)], Congress has authority to lift such restrictions in whole or in part, replacing them with equivalent or less restrictive regulatory alternatives that single out the parties to the AT&T litigation, as an exercise of its authority under the Necessary and Proper Clause, Art. I, section 8, cl. 18, to "carr(y) into Execution" the powers of the Article III judiciary. Because such parties have already been singled out through enforcement activity of the executive branch, in litigation supervised by the judicial branch, Congress may likewise address its legislative substitute for the MFJ to those par-

ties in particular, again provided that it avoids imposing more burdensome restrictions, or restrictions that violate the first amendment.

*Telecommunications Policy Act (Pt. 1): Hearings Before the Subcomm. on Communications and Finance of the House Comm. on Energy and Commerce,* 101st Cong. 416 (1990) (testimony of Professor Laurence H. Tribe, Tyler Professor of Constitutional Law, Harvard Law School). Such a comparison appears reasonable, given that a common definition for "punish" is "to inflict injury or loss upon." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1843 (1993). And it is hard to imagine how § 271 inflicts injury on Bell-South when it was already prevented under the MFJ from entering the in-region long distance service market.

Although we acknowledge that it may at times be difficult to compare a party's status before and after the enactment of regulatory legislation to determine whether the legislation inflicts punishment, we nonetheless believe that such a comparison is relevant to our analysis. In this case, it is clear that § 271's restrictions are not more burdensome than those of the MFJ. BellSouth argues that under the MFJ, a BOC could petition for the removal of a line-of-business restriction if it could show that "there is no substantial possibility that [it] could use its monopoly power to impede competition in the relevant market." MFJ, 552 F.Supp. at 195. It then points out that, if the parties to the MFJ consented, a line-of business restriction could be removed if the BOC could show that the change was in the public interest. *See United States v. Western Elec. Co.,* 900 F.2d 283, 306 (D.C.Cir.1990). But now, argues BellSouth, the process is more burdensome, because § 271 subjects it to "an indefinite procedure of FCC and Department of Justice review." Brief for Appellants at 21. Our view of the situation is quite different.

Section 271, at worst, provides the BOCs with the possibility of immediate entrance into the in-region long distance services market, by following a clearer path than that provided under the MFJ. As the Fifth Circuit pointed out, "the Special Provisions gave the BOCs a clear delineation of what they needed to do to achieve a lifting of all the old MFJ restrictions in the future—certainly a step up, from the BOCs' perspective, from being under [the District Court's] perpetual supervision. It is perhaps for this reason that the BOCs have apparently consistently represented, outside of litigation, that they were pleased with the Act." *SBC Communications (5th),* 154 F.3d at 244; *see, e.g., BellSouth Reaction to President Clinton's Signing of the Telecommunications Act of 1996,* PR Newswire, Feb. 8, 1996, *available in* WESTLAW, PRWIREPLUS database (reporting that BellSouth's Chairman applauded the Act and noted "bipartisan and industry wide support" for it). In short, as a qualitative matter, the BOCs are no worse off under § 271 than they were under the MFJ; and there are many who think their position has vastly improved. In any event, we are confident that § 271 does not constitute "punishment," either as a matter of constitutional law under the bill of attainder clause or as a matter of common sense.

### B. Equal Protection

BellSouth also argues that the application of § 271 denies it equal protection under the Fifth Amendment. We disagree.

■ As the Court stated in *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." As we found in *BellSouth I,* "the differential treatment of the BOCs and non-BOCs is neither suggestive of punitive purpose nor particularly suspicious." 144 F.3d at 67. Nor does § 271 infringe a fundamental constitutional right. Accordingly, we need only subject § 271 to rational basis scrutiny.

■ As explained above, Congress clearly had a rational basis for singling out the BOCs, *i.e.,* the unique nature of their control over their local exchange areas. *See supra* Part II.A.2. Thus, it was undoubtedly ra-

tional for Congress to restrict the BOCs' entry into the long distance services market. By no stretch of the imagination can it be found that § 271 violates equal protection. *See Beach Communications,* 508 U.S. at 315–16, 113 S.Ct. 2096 ("[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.... Defining the class of persons subject to a regulatory requirement—much like classifying governmental beneficiaries—'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'") (quoting *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)). And, as we noted in *BellSouth I,* the bill of attainder inquiry is "more exacting than a rational basis test." 144 F.3d at 67. Therefore, in light of our decision that § 271 does not violate the bill of attainder clause, we must conclude *a fortiori* that it does not violate the equal protection clause.

### C. Separation of Powers Challenge

■ BellSouth next argues that § 271 is contrary to the principle of separation of powers. It concedes that "Congress may modify generally applicable rules and thereby supersede a prior consent decree arising from those underlying rules." Reply Brief for Appellants at 4. However, the problem, according to BellSouth, is that § 271 "pinpoint[s]" the BOCs, and replaces the restrictions imposed on them by the MFJ with what Congress "deem[ed] ... a more appropriate sanction." *Id.* BellSouth contends that, in so doing, Congress interfered with the prerogative of the judicial branch. Although we agree with BellSouth that Congress may not reopen "the last word of the judicial department," *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 227, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), we do not agree that § 271 implicates this concern.

In *Pennsylvania v. Wheeling and Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855), the Court had entered a final judgment in 1851, ordering the private owner of a bridge across the Ohio River to either remove or raise a bridge because it obstructed traffic along the river. *See id.* at 429. After that decision, Congress passed legislation that made the bridge in question a postroad, which meant that the bridge could remain in place with no interference from navigation along the river. *See id.* The bridge was then destroyed by a storm. *See id.* at 422. When the owner began to rebuild the bridge, the state of Pennsylvania filed suit to prevent its reconstruction based on the Supreme Court's original finding that the bridge was a nuisance. *See id.* Faced with this dilemma, the Court held that the legislation was not unconstitutional, because the injunctive remedy awarded in 1851 was "a continuing decree," *see id.* at 431, and, thus, could be modified by Congress. As a result, the statute passed by Congress prevented the Court from enjoining the construction of the bridge. *See id.* at 431–32. Therefore, as the Fifth Circuit pointed out, "under [*Wheeling*], it has long been clear that Congress may change the law underlying ongoing *equitable* relief, even if, as in *Wheeling* itself, the change is specifically targeted at and limited in applicability to a particular injunction, and even if the change results in the necessary lifting of that injunction." *SBC Communications (5th),* 154 F.3d at 245.

The Supreme Court recently revisited the separation of powers doctrine in *Plaut.* There, Congress had passed a statute that would have allowed cases alleging claims under the Securities Exchange Act § 10(b) that had been dismissed as time-barred to be reinstated. *See Plaut,* 514 U.S. at 214–15, 115 S.Ct. 1447. The Court held that the statute violated separation of powers principles, because it reopened final judgments of the judiciary. *See id.* at 240, 115 S.Ct. 1447. The Court was careful, however, not to overrule *Wheeling,* "implicitly [drawing] a ... distinction between two kinds of final judgments for separation of powers purposes—final judgments without prospective effects, which could not be constitutionally revised through legislation, and final judgments with prospective effects, whose *effects* could constitutionally be so revised." *Benjamin v.*

*Jacobson,* 124 F.3d 162, 171 (2d Cir.1997); *see Plaut,* 514 U.S. at 232, 115 S.Ct. 1447 (stating that "nothing in our holding today calls [*Wheeling*] into question").

The 1996 Act did not reopen a final judgment, but rather eliminated the prospective effects of the MFJ, and provided new restrictions to govern the future acts of the BOCs in its place, such as those found in § 271. Our analysis is not altered by the fact that Congress targeted the BOCs for different treatment, because the Court upheld precisely this type of specificity in *Wheeling.*

Moreover, BellSouth's argument appears to be the same argument that SBC made to the Fifth Circuit regarding separation of powers, *i.e.,* "a not-too-well-defined argument that all of the problematic aspects of the Special Provisions—including particularly their specificity, their interference with the MFJ, and the near-punitive nature of the liability they impose—when added together somehow amount to a separation-of-powers violation that is greater than the sum of its parts." *SBC Communications (5th),* 154 F.3d at 246. But in *Plaut,* the Court made clear that "[i]t makes no difference whatever to [the] separation-of-powers violation ... that it is not accompanied by an 'almost' violation of the Bill of Attainder Clause." 514 U.S. at 239, 115 S.Ct. 1447; *see SBC Communications (5th),* 154 F.3d at 246. Thus, although BellSouth is troubled by the particularity with which § 271 operates, and the fact that it believes § 271 is at least near-punitive, this combination does not change the result of our analysis of the separation of powers claim. We agree with the Fifth Circuit that § 271 does not violate separation of powers principles.

*D. The Proceedings Under § 271(c)(1)(B)*

■ BellSouth also argues that the FCC erred in finding that it was foreclosed from proceeding under § 271(c)(1)(B), Track B, which would allow it to provide long distance services inregion. Under Track B, as discussed above, a BOC may apply to provide long distance services if it can show that "no potential facilities-based provider of the type of telephone exchange service described in § 271(c)(1)(A) requested access and interconnection to BellSouth's network." *Order* ¶ 65.

BellSouth argues that in order to foreclose Track B, a "competing provider must be taking reasonable steps toward implementation" of a request. Reply Brief for Appellants at 15; *see* Brief for Appellants at 33. This interpretation of Track B, contends BellSouth, is based on the statute as well as the *Oklahoma Order. See* Brief for Appellants at 33; Reply Brief for Appellants at 15–18. The FCC counters that there is no "reasonable steps" requirement under Track B; instead, the "reasonable steps" language in the *Oklahoma Order* was only used in a discussion of what might be considered when making a decision regarding subsequent, not initial, applications. *See* Brief for Appellee at 31–32; *Oklahoma Order* ¶ 58.

In *SBC Communications,* this court had the opportunity to determine what type of request foreclosed Track B. *See SBC Communications,* 138 F.3d at 417–21. In that case, the FCC found that "Track B was foreclosed the moment a provider requested interconnection so long as [the FCC] could predict that the carrier would, after implementing the agreement, provide competitive service to both residential and business customers, at least predominantly over its own facilities." *Id.* at 417. This court enforced the agency's interpretation of the Track B statute because "under [*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ] we must give deference to the Commission's interpretation if it is a permissible reading," and the court had "no doubt that [the FCC's interpretation] passes that test; indeed it may ... be the only reasonable interpretation." *Id.* at 421. Notably, there is no mention of reasonable steps in this definition. Accordingly, the FCC need not find that a requesting provider has taken reasonable steps before Track B is foreclosed to a BOC; it must only be able to predict that a provider who requests interconnection would be able to provide competitive services "to both residential and business customers, at least predominantly over its own facilities." *Id.* at 417.

BellSouth objects to what it sees as the "gaming" aspect of Track B. It argues that if there is no reasonable-steps requirement, "the FCC all but ensures that some carriers (particularly incumbent long distance carriers) will block Track B for months or years." Reply Brief for Appellants at 17. As the FCC explained in its *Order*, however, the statute prevents this type of gaming: if the state commission certifies that a requesting provider has failed to negotiate in good faith or has failed to comply with the implementation schedule in an agreement, a qualifying request by that provider would be ignored. *See Order* ¶ 64. Thus, if either of these two situations occurred, Track B would be available to the BOC. Accordingly, there is no need for a "reasonable steps" requirement.

BellSouth counters that this answer is illusory, because the agreements often lack implementation schedules. *See* Brief for Appellants at 36–37. But, as the FCC points out, "BOCs are not precluded from insisting that implementation schedules be included in interconnection agreements." Brief for Appellee at 34–35; *see SBC Communications,* 138 F.3d at 420. Moreover, "[i]n any event, this argument does not really go to congressional purpose ... but rather to the adequacy of the remedy Congress provided." *SBC Communications,* 138 F.3d at 420.

BellSouth never offered any evidence that it did not receive any qualifying requests; instead, it rested solely on evidence that no carrier had taken the reasonable steps it thought were necessary to constitute a qualifying request. *See Order* ¶¶ 65–67 (noting that BellSouth received requests from twenty-six carriers with signed interconnection agreements, only three of which BellSouth discussed in its application). Thus, we deny BellSouth's petition to review the FCC's decision, because it is clear that BellSouth failed to demonstrate that it is eligible to proceed under Track B.

### E. Satisfaction of Certain Competitive Checklist Items Under § 271(c)(2)(B)

BellSouth also argues that the FCC erred in its application of the competitive checklist of § 271(c)(2)(B). This argument concerns whether the FCC attempted to "dictate how

... interconnection, unbundled access, [or] resale ... should be priced" in violation of the Eighth Circuit's mandamus order in *Iowa Utilities Board v. FCC,* 135 F.3d 535 (8th Cir.1998), *petition for cert. filed,* 66 U.S.L.W. 3623 (U.S. Mar. 13, 1998) (No. 97–1519). Reply Brief for Appellants at 18 (internal quotation marks omitted). The mandamus order in the second *Iowa Utilities* case is based on the Eighth Circuit's decision in *Iowa Utilities Board v. FCC,* 120 F.3d 753 (8th Cir.1997), which the Supreme Court has agreed to review. *See* —— U.S. ——, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998).

Because the FCC relied on BellSouth's failure to comply with the competitive checklist items only as an alternative ground for its denial of BellSouth's application, *see Order* ¶ 76, we see no reason to offer any opinion on the FCC's findings with respect to this issue.

### III. Conclusion

For the reasons set forth above, we deny BellSouth's petition for review of the FCC's decision.

*So ordered.*

SENTELLE, Circuit Judge, *concurring in the result*:

As the majority opinion exhaustively sets forth, in the present appeal BellSouth mounts the same sort of constitutional attack on 47 U.S.C. § 271 that it previously pursued unsuccessfully against 47 U.S.C. § 274 in *BellSouth Corp. v. FCC,* 144 F.3d 58 (D.C.Cir.1998) ("*BellSouth I*"). In the prior case BellSouth and the other Bell operating companies ("BOCs") argued that Congress had punished their prior anti-competitive conduct by singling them out by name for legislative debarment from participation in the lucrative line of business constituting electronic publishing. In the present case they assert the unconstitutionality of § 271 on the same basis, as it singles them out by name for disqualification from immediate entry into the business of providing in-region long distance telephone service until they comply with burdens not imposed on any other entity no matter how similarly situated.

I found their arguments persuasive in *Bell-South I*. *See* 144 F.3d at 71–74 (Sentelle, J., dissenting). I find them equally persuasive today.

As the majority today sets forth, Article I, section 9, clause 3 of the Constitution prohibits Congress from passing any "Bill of Attainder or ex post facto Law." *See* Maj. op. at 683. As the majority further recognizes, that clause prohibits any statute that "(1) applies with specificity, and (2) imposes punishment." Maj. op. at 683. Specificity is not at issue here. Section 271, like § 274, specifies its applications solely to the BOCs by their names. It does not apply to any other of the "over 1,300 local exchange carriers," *BellSouth I*, 144 F.3d at 71, no matter how large or market dominant they are or become. Thus, under the two-part test correctly set forth by the majority, if § 271 imposes punishment it is an unconstitutional bill of attainder. It does, and it is.

The Supreme Court has previously "announced a three part test to determine whether a statute imposes 'punishment' for purposes of the Bill of Attainder Clause":

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish.

*Id.* at 72 (quoting *Selective Serv. Sys. v. Minnesota Public Interest Research Group*, 468 U.S. 841, 852, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984)). The limitations on the BOCs constitute punishment under that three-part test.

First, this line of business limitation embodied in § 271 is a restriction of a sort falling within the historic meaning of legislative punishment. "[L]egislative bars to participation by individuals or groups in specific employments or professions" unquestionably fall within the category of punishments forbidden by the Bill of Attainder Clause. *Selective Serv. Sys.*, 468 U.S. at 852, 104 S.Ct. 3348; *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (invalidating statute barring communist party members from labor union offices); *United States v. Lovett*, 328 U.S. 303, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (striking down law cutting off salaries to three named government employees); *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867); *Ex Parte Garland*, 71 (4 Wall.) 333, 18 L.Ed. 366 (1867) (barring former confederate rebels from entry into professions). I find unpersuasive the majority's attempt to distinguish these prior cases on the basis that the "line of business" restrictions before us leave open the possibility that they may one day be overcome. I find nothing in the history of bill of attainder jurisprudence that suggests that the fact that debarment from business will or may someday end prevents the temporary or potentially temporary bar from constituting punishment.

I find even less persuasive the majority's paralleling the line of business restrictions with regulatory restrictions applicable to entire industries. While it may be true as the majority argues that environmental laws specific to an industry do not constitute punishment, I do not see how this lessens or even affects the punitive nature of a restriction applicable not to a specific industry but rather to specific named individuals or corporations within an industry inapplicable to others in the same industry, whether or not similarly situated. Both punitive effect *and* specificity are necessary to render a legislative enactment an unconstitutional bill of attainder. Supreme Court precedent upholding regulatory restrictions (whether punitive or not) where specificity is lacking is inapposite. *See, e.g., FCC v. National Citizens Committee for Broad.*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Board of Governors of Fed. Reserve Sys. v. Agnew*, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408 (1947). In short, in my view, the first prong of the three-part test of bill of attainder status is plainly met.

Second, as to whether the statute furthers nonpunitive legislative purposes, the laudable goal of opening the telecommunications industry to competition by deregulating the long distance market is not served by forbidding specific persons, whether natural or corporate, from competing on the same terms as

others. If the BOCs possess characteristics that require that they be more stringently regulated than other entities, then Congress could further its nonpunitive goals by imposing limitations on local exchange carriers of a certain size or market dominance. I do not see how this provision specifying the individual Bell operating companies furthers the nonpunitive goals of the new statutory regime; rather, it furthers the punitive goal of penalizing their past anticompetitive conduct. Pursuit of this punitive goal strikes at the heart of the prohibition against "Bills of Attainder" and "ex post facto Laws" which constitute an essential part of the Constitution's structural separation of powers among the branches of government: the redress of past conduct is the province of the Judiciary, not of the Legislature. As we recognized in *BellSouth I*, Article I, section 9, clause 3 of the Constitution was designed to prevent punishment "without the benefit of a judicial trial." *BellSouth I*, 144 F.3d at 62.

As to the third element of the *Selective Service System* test, that is, whether the legislative record evinces a congressional intent to punish, as I stated in my dissent in *BellSouth I*, while I think this "the least important" of the three factors, *id.* at 73, I think it amply met. The timing of the enactment along with its effect in undoing the termination of the prior judicial redress of the BOCs' past conduct really leaves no doubt as to Congress's motive. Congress clearly had available to it "less burdensome alternatives" under which it could have addressed its "legitimate nonpunitive objectives" while refraining from singling out the BOCs for punitive legislative treatment. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 482, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

For these reasons, were we writing on a clean slate I would vote to hold 47 U.S.C. § 271 unconstitutional as a violation of the Bill of Attainder Clause. But I recognize that we do not write upon a clean slate. *BellSouth I* announces the law of the Circuit. The prior opinions of other panels of this court bind us. *Melcher v. Federal Open Market Comm.*, 836 F.2d 561, 565 n. 4 (D.C.Cir.1987); *National Treasury Employ-*

*ees Union v. United States*, 990 F.2d 1271, 1286 n. 7 (D.C.Cir.1993) (Sentelle, J., dissenting) ("The law of this Circuit, whether in error or not, is binding absent correction by a higher court."), *aff'd in part and rev'd in part*, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). While the BOCs have labored to find distinctions between § 274 which we struck down in *BellSouth I* and § 271 which is before us today, they have produced none of constitutional significance. I therefore concur in my colleagues' decision that we must uphold § 271 as we upheld § 274.

I do not find that the BOCs' other arguments concerning the equal protection component of the Fifth Amendment or the statute's inconsistency with the constitutional separation of powers change the result. The equal protection argument is simply the bill of attainder argument dressed in different clothes. The separation of powers argument is to me a powerful one, but one which cannot carry the day. While I would agree that by undoing the judicial decision on this same subject matter, § 271—and for that matter § 274—falls afoul of the Supreme Court's reasoning in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), I do not think we could enter such a holding consistent with our precedent in *BellSouth I*. The characteristics which make these statutory sections inconsistent with constitutional separation of powers are the same ones which in my view make them inconsistent with the protections of Article I, section 9, clause 3. *See Brown*, 381 U.S. at 442, 85 S.Ct. 1707 ("The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature."). This Circuit having decided those issues adversely to the BOCs

under the more specific rationale cannot consistently decide in their favor under the more general. Therefore, again, I join the majority's result, but only for reasons of stare decisis and binding precedent, not because I believe it correct.